## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ENCORE SERIES Inc. d/b/a | : | |
| THE PHILLY POPS | : | |
| **Plaintiff** | : | |
| v. | : | **CIVIL ACTION NO. 2:23-cv-01421** |
| | : | |
| THE PHILADELPHIA ORCHESTRA | : | |
| and THE PHILADELPHIA | : | |
| ORCHESTRA AND KIMMEL | : | |
| CENTER, INC. | : | |
| | : | |
| **Defendants** | : | **JURY TRIAL DEMANDED** |

### PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF SPECIFICALLY, PLAINTIFF'S REQUEST FOR A PROMPT HEARING TO ESTABLISH THE ELEMENTS NECESSARY TO OBTAIN PRELIMINARY <u>INJUNCTIVE RELIEF</u>

## I.     RELEVANT PROCEDURAL AND FACTUAL HISTORY

Defendants have responded to Plaintiff's motion seeking a prompt hearing on its Motion for Limited Injunctive Relief—the reinstatement of the Philly POPS' residency at Verizon Hall pending resolution of this case.  This limited injunctive relief is essential to the Philly POPS continuing its 20+year history as a charitable non-profit corporation providing the public with live symphony concerts at Verizon Hall, an essential venue for these concerts that was designed and built with public grants and charitable donations.  The requested relief is also essential to the Philly POPS' ability to make up for or otherwise address refund requests for tickets refund tickets for concerts that were sold by Ticket Philadelphia that the Philly POPS was unable to perform at Verizon Hall after Defendants evicted the it furtherance of their well-documented and unabashed plan to eliminate competition from the Philly POPS and to monopolize the market for live symphony concerts in alleged violation of Sections 7 of the Clayton and Section 2 of the Sherman Antitrust Act as well as the common laws of Pennsylvania.

Rule 65 of the Federal Rules of Civil Procedure contemplates that the Court will conduct an evidentiary hearing to determine whether Preliminary Injunctive is appropriate under four factors: 1) whether the moving party has a reasonable probability of success on the merits of one or more of its claims; 2) whether irreparable harm will result if the relief is not granted; 3) whether the requested relief will result in greater harm to the non-moving party; and 4) whether the relief sought is in the public interest.

The Philly POPS provided the Court with an Amended Verified Complaint detailing its federal and state law Claims. On the same day that it filed its Opposition to the POPS' request for a hearing on its request for preliminary injunctive relief, the Defendants filed an Answer and Affirmative Defenses to Plaintiffs Claims. Significantly, however, Defendants did not move to dismiss any of the POPS' claims pursuant to Fed. R. Civ. P. 12(b) (6) (failure to state a claim upon which relief can be granted), a motion that must be made under Rule 12(b) if at all, by motion prior to the filing of a responsive pleading. We respectfully submit that Defendants' failure to file a Rule 12(b)(6) motion substantially undercuts Defendants argument that there is no need for a hearing because the POPS cannot show a reasonable likelihood of success on the merits because it has no viable claims. *See* Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (Defts' Opp. Mem.) at pp.8-11.

In Section II of its Opposition Brief, Defendants initially argue that there is no need for an evidentiary hearing regarding the POPS' limited request for preliminary injunctive relief because the POPS has lost its right to the use of Verizon Hall and has essentially admitted that it is no longer entitled to the use of Verizon Hall. Defendants point to a March 31, 2021 Amendment to the POPS' License Agreement entered into between the POPS and prior management of the Kimmel Center, Inc, (referred to as KCI) in order to implement a payment

plan for the POPS to retire a Pre-Pandemic arrearage in the amount of $548,015.78. *See* Exhibit A to Defts. Opp. Mem.). This agreement was signed by KCI prior to announcement of the consolidation of the Philadelphia Orchestra and KCI into POCK. It provides in at Paragraph 3 A that: "KCI shall have no obligation to provide the Premises to Licensee for any performance or any other activities unless (a) Licensee has executed this Amendment and (b) there has been no Event of Default." Defendants argue that the POPS defaulted on its time payment obligations but provides no evidence of same. Defendants apparently argue that this alleged default persisted through January 17 2023 when Defendants evicted the POPS form Verizon Hall and thus, the POPS consented to the eviction. *See* Defs. Opp. Mem at p. 6.

Defendants omits however, that the POPS fully paid this $548,015.78 obligation far ahead of schedule, on or about September 16 2022 by making advance lump sum payments substantially prior to when each of the $10,000 monthly payments were due under the terms of this agreement. *See* spread sheet extracted from the POPS Quick Books record showing wire transfers in full payment of this obligation attached here to as Exhibit 1. Indeed, there is no evidence that the POPS defaulted on its obligations under this payment plan and, no basis on which to argue that the POPS consented or agreed to its eviction from the Kimmel Center in January 2023.

Significantly, the POPS also retired another payment plan agreed to by POKC after the 2021 consolidation of the Philadelphia Orchestra and KCI. Unlike the prior payment plan, the second payment plan was not memorialized by any written instrument. Rather, it was confirmed by an e-mail from Karen Corbin of the POPS to Mario Mestichelle of POCK. *See* spread sheet extracted from the POPS Quick Books records attached hereto as Exhibit 2. showing payments in the amount of $352,207.12 along with the above-referenced e-mail. Finally, it appears from

the POPS Quick Books records that the POPS paid KSI and later POKC, a total of about $1.5 million for services rendered in connection with concerts performed at Verizon Hall shortly prior to and after Verizon Hall was closed by the COVID Pandemic. Indeed, it became a regular course of conduct for the parties to use payment plans to pay of services provided by KCI and later POKC. ter POKC. *See* spread sheet extracted from the POPS Quick Books records attached hereto as Exhibit 3. Thus, we submit that Defendants' arguments that either the POPS consented to its January 20, eviction in January 20, 2023 or that it was chronically in default of its payment obligations are unavailing.

Similarly, Defendant's argument that the POPS chronically defaulted on its payment obligations to KSI or POKC are also unavailing. Under prior management, KSI routinely offered the POPS payment plans to retire past due amounts for services provided by KSI. And all of these obligations were satisfied under the terms extended by prior KSI management. Even after KSI was consolidated with the Philadelphia Orchestra under POKC, the POPS was allowed to pay for services provided by POKC prior to May of 2022 over a three month time period extending through July of 2022 without any formal written agreement. And it made the promised payments as shown by a Spread Sheet extracted from the POPS Quick Books Accounts attached hereto Exhibit 2. Indeed, the Spread Sheet extracted from the POPS Quick Books Accounts attached herto as Exhibit 3 shows that between March of 2020 and October of 2022, the POPS had nearly $1.5 million to KSI and later POKE for services rendered pursuant to its Licensing Agreement with KSI as Amended in March of 2021.

Finally, the Defendants' argument that the POPS owed POKC about $1 million at the time of its eviction is belied by the POCK's eviction letter of January 17 2023, with a purported Statement of Invoices, Fees and Estimates incurred between 10/1/22 – Current. (Attached hereto

as Exhibit 4). Even though—as alleged in the POPS Amended Verified Complaint—the charges listed on the purported statement were highly inflated, the total demanded to be paid immediately or almost immediately was only about $600,000. However, as the evidence will show at the hearing, the $352,600 charge for the POPS 2022 Christmas Concerts was inflated by approximately 77% over what the POPS paid for its 2019 Christmas Concert at Verizon Hall Moreover, the $165,374 in purported Ticked Philadelphia fees were largely attributed to a Scheduled February 2023 concert for which payment was not yet due.[1] Finally, the $82,000 charge for the "Get Up Stand Up" concert in late February were not yet due. Nevertheless, in order to induce POKC to back off on its immediate eviction from Verizon Hall, POPS offered a plan to pay $150,000 immediately with payments totaling $1 million spread over the balance of the 2023 concert season. Contrary to it and its and KCI's prior course of conduct, POCK summarily rejected this offer.

## II.    THE PRELIMINARY INJUNCTION STANDARDS

We respectfully submit that the Defendants' arguments regarding the four factors that the Court must consider in order grant the limited injunctive relief requested by the POPS are misplaced or unavailing. In this regard we first invite the Court's attention to what appears to be the only case in this District discussing a requested preliminary injunction in connection with claims under both Section 7 of the Clayton Act and Section two of the Sherman Act—*Tasty Baking Company v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987). There, Judge Fullam engages in a scholarly discussion of the elements of both antitrust claims including

---

[1] Defendants may argue that POKC had the authority to force the POPS to pay 30 days in advance for estimated production or venue related services by virtue of Paragraph 3 E of the amendment to the POPS' Licensing agreement. However, it is clear we submit that this amendment (as were all other amendments) were specific to the payment plan. Moreover, any perceived ambiguity regarding this issue should be resolved against the drafter of the agreement, KCI.

standing and antitrust injury as well market share, monopoly power and attempted monopolization. Although, *Tasty Baking* involves a horizontal rather than vertical consolidation it is clear that both types of mergers or consolidation can violate Section 7 of the Clayton Act,and coupled with anticompetitive behavior, the acquiring entity can violate Section 2 of the Sherman Act.

Significantly the court found that a private plaintiff had standing to challenge an acquisition or consolidation of competitors and was directly injured by the defendant's anticompetitive conduct.[2] Moreover, the *Tasty Baking* Court found that a acquisition or consolidation that resulted in as little as 34% of the relevant product and geographic markets presumptively violated the Clayton Act. Here, by contrast the Philadelphia Orchestra/ KCI consolidation resulted in the Philadelphia Orchestra eliminating its *only* competitor for the performance of live symphony concerts and thereby achieved monopoly power in the relevant markets.

A.      **Reasonable Probability of Success on the Merits**

The POPS respectfully submits two documents that will be introduced as evidence at the hearing, that shed substantial light on the issue of whether there is a reasonable probability that the POPS will be successful on the merits on one or both of its antitrust causes of action.

---

[2] See also *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022) (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993)). Holding that the Court will consider the following factors in connection with standing for a private antitrust plaintiff  (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages."

First, attached as Exhibit 5, is an e-mail dated August 22, 2022 to the President and CEO of the POPS from the from the President and CEO of the Philadelphia Orchestra who also became the President and CEO of POKC by virtue of the consolidation of the Philadelphia Orchestra and KCI. The e-mail clearly discloses the Philadelphia Orchestra's intent to "take over the POPS' programing and production of concerts at the Kimmel Center for the before the start of the 2022-2023 concert season. In order to advance this plan, Mr. Tarnopolsky offered the POPS' CEO a membership on the Board of Directors of the Philadelphia Orchestra but then threatened that KCI and Ticket Philadelphia "will continue to withhold all services (ticketing and venue) until POPS either paid up for these services or other agreeable terms regarding a transition [of POPS programming and performances] are settled upon." After the POPS' CEO advised Tarnopolsky that he was not interested in being a member of the Orchestra's Board of Directors, Executives of the Philadelphia Orchestra doubled down by presenting the POPS' representatives with an outline of the implementation of a plan for the POPS to go out of business at the end of the 2022-2023 season and announce to the public that the POPS programing would be assumed by the Philadelphia Orchestra. *See* Exhibit 6.

The evidence will show that the POPS considered this proposal but ultimately rejected it, whereupon, as discussed above, POKC "jimmied up" a statement of allegedly past due and projected production costs at Version Hall,as well as Ticket Philadelphia fees in order to support the POPS' eviction from Verizon Hall after the POPS had already sold a substantial number of season tickets as well as tickets for some of its scheduled performances.[3]

---

[3] Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." *McGary v. Williamsport Reg'l Med. Ctr.*, 775 F. App'x 723, 728 (3d Cir. 2019) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007)). "To prevail on a monopolization claim, a plaintiff must prove: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

Thus, we submit that the POPS will show a reasonable probability that it will be successful on the merits of at least one of its antitrust and state law claims.

**B.     Irreparable Harm if Limited Preliminary Injunctive Relief Is Not Granted**

In the *Tasty Baking* case, Judge Fullam found that the both the Plaintiff and competition would be irreparably harmed by the consolidation of two competitors because the Plaintiffs loss of business as a result of the consolidation would be hard to quantify. *Tasty Baking*, 635 F. Supp. at *1277. Here by contrast it is highly like that the POPS ability to perform symphony concerts going forward will be lost forever if the requested relief is not granted. Moreover, the POPS has suffered a substantial but unquantifiable loss of reputation as result to Defendants' allegedly unlawful activities and will not be able to partially or wholly restore its reputation unless the requested injunctive relief is granted and the POPS is allowed to perform concerts at Verizon Hall for the concerts that it was forced to postpone or cancel by the Defendants' conduct. At minimum the POPS should be permitted to explain and provide evidence of these consequences at an evidentiary hearing on its motion the requested preliminary injunction. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F.3d 192, 205 n.8 (3d Cir. 2014) (district court not precluded from drawing inference of irreparable harm from testimony as to likely loss of reputation among actual and potential customers)

---

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id*. at 728-29 (quoting *Broadcom Corp*. at 306-07). Anticompetitive conduct occurs when a competitor attempts "to exclude rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 605, (1985), or when it competes "on some basis other than the merits," *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003). *See also, Radio Music License Comm., Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 500 (E.D. Pa. 2014); *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108–09 (3d Cir.2010).

**C.      Greater Harm to the Non-Moving Parties**

For the last 20+years it appears that the Kimmel Center had no difficulty in accommodating both the POPS and the Philadelphia Orchestra for multiple concerts during the concert season as well as other events such as graduations.  Although Defendants are apparently in the process of finding other suitable tenants for Verizon Hall its does not appear from their submission that they have been successful in filling all or some of dates when the POPS has historically performed concerts at Verizon Hall.    Thus, it is questionable at this point in time whether the Defendants will be harmed at all if the requested injunctive relief is granted.

**D.      Public Interest**

There can be no argument that it is not in the public interest for the POPS to be able to perform live symphony concerts at Verizon Hall.   As admitted in the August 22nd e-mail attached to this Memorandum as Exhibit 5 there is a substantial public demand for POPS concerts at the Verizon Hall which it appears that the Philadelphia Orchestra and POKC was anxious to replace with concerts performed by the Philadelphia Orchestra.  Moreover, as stated above, the Kimmel Center was built with public and private grants or donations so that the residents of the Philadelphia Metropolitan Area, as well as visitors to Philadelphia, would be able to enjoy the variety of concerts performed by the two symphony orchestras.

**E.      Security**

We respectfully submit that Defendants put the proverbial cart before the horse in arguing that the Court should deny a hearing on the POPS' Motion for Limited Preliminary Injunctive Relief because it does not have the ability to provide security for the requested injunctive relief. Fed. R. Civ, P. 65(4)(e) provides for security in a amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined and

restrained.  Here the POPS asks only that it be reinstated at Verizon Hall pending the resolution of this litigation.  As argued above it does not appear that POKC will be harmed because there will be a sufficient number of open dates to accommodate POPS concerts as there have been for the past 20+ years that the POPS and Philadelphia shared Verizon Hall.  This would leave the costs of these performances and the POPS is willing and able to provide security for the reasonable amount of same.

### III.   CONCLUSION

For all the foregoing reasons, we respectfully submit that the Court schedule a hearing on the Plaintiff's Motion Limited Preliminary Injunctive Relief.

Dated:  June 30, 2023

Respectfully Submitted,

/s/ *William A. DeStefano*
William A. DeStefano
Terri A. Pawelski
**SAXTON & STUMP**
123 South Broad Street, 28th Floor
Philadelphia, PA  19102

*Counsel for Encore Series, Inc. d/b/a The Philly POPS*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of June, 2023, a true and correct copy of the foregoing Plaintiff's Reply to Defendant's Opposition to Motion for Limited Preliminary Injunctive Relief was served on all counsel appearing of record in this case, by means of the Eastern District of Pennsylvania's ECF filing and service system.

/s/ *William A. DeStefano*

Exhibit 1

**KIMMEL CENTER INC**
**FISCAL YEAR PAYMENT PLAN 1**

| Date | Amount | Note |
|---|---|---|
| 3/6/2020 | $ 23,718.00 | 10736 |
| 3/6/2020 | $ 32,601.00 | 10735 |
| 5/20/2020 | $ 50,000.00 | WIRE |
| | | |
| 4/1/2021 | $ 187,155.39 | WIRE |
| 6/4/2021 | $ 10,000.00 | WIRE |
| 7/1/2021 | $ 10,000.00 | WIRE |
| 7/30/2021 | $ 10,000.00 | WIRE |
| 8/31/2021 | $ 10,000.00 | WIRE |
| 9/24/2021 | $ 93,989.35 | WIRE |
| 10/27/2021 | $ 2,131.29 | 382 in larger deposit |
| 11/1/2021 | $ 10,000.00 | WIRE |
| 11/30/2021 | $ 10,000.00 | WIRE |
| 1/3/2022 | $ 10,000.00 | WIRE |
| 2/2/2022 | $ 10,000.00 | WIRE |
| 3/1/2022 | $ 10,000.00 | WIRE |
| 4/7/2022 | $ 10,000.00 | WIRE |
| 5/9/2022 | $ 10,000.00 | WIRE |
| 6/2/2022 | $ 10,000.00 | WIRE |
| 7/5/2022 | $ 10,000.00 | WIRE |
| 7/29/2022 | $25,000.00 | WIRE |
| 9/16/2022 | $ 3,420.75 | Wire in larger Deposit 160,000.00 from plan 2 |
| **Total Paid for FY20-2** | **$ 548,015.78** | |
| TOTAL of PAYMENT P | $548,015.78 | |
| | Balance 0  Retired | |

## <u>AMENDMENT TO RESIDENT COMPANY LICENSE AGREEMENT</u>

**THIS AMENDMENT TO RESIDENT COMPANY LICENSE AGREEMENT** (the "Amendment") is made as of the 31st day of March, 2021 ("Amendment Effective Date") by and between Kimmel Center, Inc. ("KCI") and Encore Series, Inc. d/b/a The Philly Pops ("Licensee") (collectively, the "Parties").

**WHEREAS**, KCI and Licensee entered into an Amended and Restated Resident Company License Agreement dated August 14, 2018 (the "License Agreement"); and

**WHEREAS**, KCI issued a default letter to Licensee on July 1, 2020 arising from Licensee's failure to comply with its payment obligations under the License Agreement (the "Arrearage"); and

**WHEREAS**, the current amount of the Arrearage is $548,015.78, not including interest and administrative fees as provided by the terms of the License Agreement; and

**WHEREAS**, the Parties wish to memorialize agreements reached to settle the Arrearage and revise other terms of the License Agreement, as set forth below;

**NOW, THEREFORE**, it is understood and agreed between the Parties as follows:

1. Licensee agrees to pay KCI the following payments to resolve the Arrearage (the "Settlement Amount"). Licensee agrees to pay the Settlement Amount in installments upon the following schedule:

    A. A payment of Twenty-Three Thousand Seven Hundred Dollars and Thirty-Nine Cents ($23,700.39) (which includes the first installment payment of Ten Thousand Dollars ($10,000.00), plus a one-time 2.5% administrative fee on the Arrearage in the amount of Thirteen Thousand Seven Hundred Dollars and Thirty-Nine Cents ($13,700.39)) upon full execution of this Amendment.

    B. Within five (5) days of the full execution of this Amendment by the parties: an installment payment in the amount of $99,455.00. Upon timely receipt by KCI of said installment and the payment set forth in Section 1. A. above, Licensee's existing defaults under the License Agreement shall be deemed to have been waived.

    C. On the first of each month following full execution of this Amendment, installment payments of Ten Thousand Dollars ($10,000.00), until such time as the full amount of the Arrearage is paid off, which shall include interest as provided by the License Agreement on overdue amounts through the date of this Amendment only. The final monthly installment payment shall be in such amount to total the full Settlement Payment, which may be less than Ten Thousand Dollars ($10,000.00).

2.	The amounts of the installment payments set forth in Section 1. C. shall be subject to review and acceleration as set forth in this Section 2. At the conclusion of each Licensee fiscal year, the Parties will review Licensee's revenue. Notwithstanding anything to the contrary set forth herein, the installment payments shall be increased such that KCI shall receive the greater of (i) $120,000 or (ii) 4% of Licensee's total earned revenues. In addition, in the event Licensee receives federal U.S. Small Business Administration (SBA) Shuttered Venue Operator Grant or Paycheck Protection Program (PPP) Grant funds, Licensee shall pay KCI 10% of such grant funds within thirty (30) days of receipt. If Licensee fails to make any payment required herein when due, the Settlement Amount shall be increased to include interest through the date Licensee is current on all outstanding amounts.

3.	The Parties acknowledge and agree that the License Agreement is hereby amended such that:

A.	KCI shall have no obligation to provide the Premises to Licensee for any Performance or any other activities unless (a) Licensee has executed this Amendment and (b) there has been no Event of Default.

B.	**Time is of the essence with respect to each and every payment owed by Licensee under the License Agreement and hereunder.**

C.	Except as set forth in Section 3. D., it shall be an Event of Default if Licensee fails to make any required payment on the date due. Upon the occurrence of an Event of Default, Licensee shall be in default of the License Agreement and of this Amendment, without any requirement that KCI provide notice and without any cure period. In the event of an Event of Default, all remaining payments owing under the License Agreement and this Amendment, increased to include interest and administrative fees, shall be accelerated and shall be immediately due and payable.

D.	With respect to the installment payments required by Sections 1 and 2 above only, in the event Licensee fails to make the required installment payment on the date due, Licensee shall have the following notice and cure rights: Up two (2) times per KCI fiscal year, should Licensee fail to make an installment payment on the date due, KCI shall provide Licensee with written notice (email notice shall be sufficient) that KCI has failed to receive the required payment. So long as Licensee remits the missed payment within three (3) days of its original due date, the late installment payment shall not constitute an Event of Default. Licensee shall have this notice and cure right no more than twice per KCI fiscal year, and solely with respect to the installment payments required by Sections 1 and 2 (and shall not have the notice and cure right in connection with fees, or estimates thereof, payable in connection with any Licensee use of the Premises). Email notifications to Licensee for purposes of this Section 3. D. shall be sent to fgiordano@phillypops.org, with a copy to kcorbin@phillypops.org.

E. Licensee shall pay to KCI 100% of the fees, or estimates thereof, for each use of the Premises no later than thirty (30) days in advance of such use. KCI shall develop, in good faith, estimates based on the prior Season's average billings, subject to final settlement of any balances of rents and other charges within sixty (60) days of the conclusion of each production.

F. Upon payment in full of the Arrearage, provided there has been no Event of Default, KCI shall be deemed to have waived further any right to collect any interest on the Arrearage or any further related administrative fees. If there is any Event of Default at any time, interest and administrative fees shall be charged on all past due amounts for the entire period those amounts have been past due.

4. In addition to the rights and remedies set forth herein, KCI reserves all of its rights and remedies under the License Agreement.

5. Capitalized terms in this Amendment which are not defined herein shall have the meanings given to them in the License Agreement.

6. Except to the extent specifically amended hereby, the License Agreement shall remain in full force and effect. To the extent the provisions of this Amendment conflict with the provisions of the License Agreement, the provisions of this Amendment shall govern.

7. This Amendment may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but all counterparts shall together constitute one instrument.

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the day and year first above written.

**KIMMEL CENTER, INC.**

By: _____

Print Name: _____

Title: _____

**ENCORE SERIES, INC. d/b/a THE PHILLY POPS**

By: _____ 03.30.21

Print Name: Frank Giordano

Title: CEO

3

# Exhibit 2

**KIMMEL CENTER INC**
**FISCAL YEAR PAYMENT PLAN 2**

| | | | |
|---|---|---:|---|
| 3/9/2022 | | | |
| | $ | 11,638.52 | WIRE |
| 6/3/2022 | $ | 83,989.35 | 12521 |
| 8/17/2022 | $ | 100,000.00 | WIRE |
| 9/16/2022 | $ | 156,579.25 | WIRE |
| **Total Paid fc** | **$** | **352,207.12** | |
| | Balance 0 RETIRED | | |

**Total to Kimmel center**

| | | | |
|---|---|---:|---|
| **TOTAL of PA** | **$** | **352,207.12** | **Open FY 22 invoices Retired balance 0** |
| **TOTAL of PA** | **$** | **548,015.78** | Retired bal 0 |
| | **$** | **900,222.90** | |

**Balance 0 in both plans**

| | |
|---|---:|
| ALL PAID bo | **1,491,039.74** |

## FW: Our DRAFT Payment Plan

**Karen Corbin**

Mon 10/3/2022 9:46 AM

To:Jessica Cook <jcook@phillypops.org>

Scroll down to see the plan for 2021-2022. Please check against Quick Books and see that we retired all of these charges, which I believe we did plus more with that last payment.

**Karen Corbin**
**Chief Operating Officer**
**The Philly POPS/Encore Series, Inc.**
office: 215.875.9667
cell:    445.206.2544



**From:** Karen Corbin
**Sent:** Tuesday, June 21, 2022 11:55 AM
**To:** Keith Obaza <kobaza@phillypops.org>; Franchelle Clemmons <fclemmons@phillypops.org>
**Subject:** FW: Our DRAFT Payment Plan

Below is our payment plan to the Kimmel to erase all debits prior to Labor Day.
Please balance against the actual invoices for the 2021-2022 Season.

**Karen Corbin**
**Chief Operating Officer**
**The Philly POPS/Encore Series, Inc.**
office: 215.875.9667
cell:    445.206.2544



**From:** Karen Corbin
**Sent:** Friday, May 6, 2022 4:51 PM
**To:** Mestichelli, Mario <MMestichelli@philorch.org>
**Subject:** Our DRAFT Payment Plan

Mario,

Thank you for your patience in waiting for our proposed payment plan.

I did spend most of the past days ensuring that we would be able to meet it.

I will accelerate it if I can. We have been in touch with the Commonwealth and anticipate being able to make the May payment for the check you are holding much earlier than the end of the month.

**Payments: $361,165.67**

**MAY 31 or before: $85,000**
**JUNE 30 or before: $150,000**
**JULY 31 or before : $127,000.**

Please let me know if you require further detail.

Have a lovely weekend,

Karen

**Karen Corbin**
**Chief Operating Officer**
**The Philly POPS/Encore Series, Inc.**
office: 215.875.9667
cell:   445.206.2544



Exhibit 3

**Type: Bill payments &middot; Delivery method: Any &middot; Name: KIMMEL CENTER**

| Date | Type | No. | Payee | Total | Attachments |
|------|------|-----|-------|-------|-------------|
| 09/16/2022 | Bill Payment (Check) | Wire# 225900023817 | KIMMEL CENTER | -160,000 00 | |
| 08/17/2022 | Bill Payment (Check) | Wire- 222900016608 | KIMMEL CENTER | -100,000 00 | |
| 07/29/2022 | Bill Payment (Check) | Wire 220900011840 | KIMMEL CENTER | -25,000.00 | |
| 7/5/2022 | Bill Payment (Check) | 12917 | KIMMEL CENTER | -10,000.00 | |
| 06/08/2022 | Bill Payment (Check) | | KIMMEL CENTER | 0 00 | |
| 06/02/2022 | Bill Payment (Check) | WIRE 2022153005 | KIMMEL CENTER | -10,000.00 | |
| 05/09/2022 | Bill Payment (Check) | Wire 202212900 | KIMMEL CENTER | -10,000.00 | |
| 04/07/2022 | Bill Payment (Check) | Wire 2022097 | KIMMEL CENTER | -10,000 00 | |
| 03/23/2022 | Bill Payment (Check) | 12521 | KIMMEL CENTER | -83,989.35 | |
| 03/01/2022 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -10,000.00 | |
| 02/28/2022 | Bill Payment (Check) | 12474 | KIMMEL CENTER | -83,989 35 | |
| 02/28/2022 | Bill Payment (Check) | 12461 | KIMMEL CENTER | -40,021 38 | |
| 02/07/2022 | Bill Payment (Check) | 12425 | KIMMEL CENTER | -83,989 35 | |
| 02/02/2022 | Bill Payment (Check) | Wire | KIMMEL CENTER | -10,000 00 | |
| 02/02/2022 | Bill Payment (Check) | 12416 | KIMMEL CENTER | -8,917 21 | |
| 01/03/2022 | Bill Payment (Check) | Wire | KIMMEL CENTER | -10,000 00 | |
| 12/29/2021 | Bill Payment (Check) | 12358 | KIMMEL CENTER | -27,377 74 | |
| 11/30/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -10,000 00 | |
| 11/18/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -84,000 00 | |
| 11/10/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -83,000 00 | |
| 11/04/2021 | Bill Payment (Check) | Wire | KIMMEL CENTER | -84,000 00 | |
| 11/01/2021 | Bill Payment (Check) | ACH | KIMMEL CENTER | -10,000 00 | |
| 10/27/2021 | Bill Payment (Check) | 0382 | KIMMEL CENTER | -5,158 32 | |
| 10/19/2021 | Bill Payment (Check) | 0345 | KIMMEL CENTER | -104,133.30 | |
| 09/24/2021 | Bill Payment (Check) | Wire | KIMMEL CENTER | -93,989 35 | |
| 08/31/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -10,000 00 | |
| 07/30/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -10,000 00 | |
| 07/01/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -10,000 00 | |

| | | | | |
|---|---|---|---|---|
| 06/04/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -10,000 00 |
| 04/01/2021 | Bill Payment (Check) | WIRE | KIMMEL CENTER | -187,155.39 |
| 05/20/2020 | Bill Payment (Check) | WIRE OUT | KIMMEL CENTER | -50,000 00 |
| 03/06/2020 | Bill Payment (Check) | 10736 | KIMMEL CENTER | -23,718 00 |
| 03/06/2020 | Bill Payment (Check) | 10735 | KIMMEL CENTER | -32,601 00 |
| | | | | **-1,491,039.74** |

Exhibit 4

Encore Series, Inc.
d/b/a The Philly Pops
1518 Walnut Street, #1706
Philadelphia PA 19102
Attn: Frank Giordano

Re:    Amended and Restated Resident Company License Agreement dated August 14, 2018
("Original License Agreement"), as amended by Amendment To Resident Company
License Agreement Dated March 31, 2021 ("Amendment", and together with the
Original License Agreement, the "License Agreement") between The Philadelphia
Orchestra and Kimmel Center, Inc., Successor-by-Merger to Kimmel Center, Inc.
("Licensor" or "POKC") and Encore Series, Inc. d/b/a The Philly Pops ("Licensee" or
"Pops")

Dear Frank:

Our two organizations spent significant time and effort to come to terms on the Amendment in
March 2021. We were assured at that time that the Pops had the financial capacity to meet the
payment terms specified in the Amendment, and that the prior years of late or non-payment
would not be repeated.

Unfortunately, the Licensee's legacy of default has continued during the twenty-one (21) months
since the execution of the Amendment. POKC has refrained from exercising the remedies
available to it under the License Agreement, and opted instead, in an effort of conciliation, to
meet with you and other Pops representatives on numerous occasions to address the non-
payment. The last payment POKC has received from Licensee was $160,000 on September 16,
2022.

This letter constitutes Licensor's express notice of Licensee's default under the License
Agreement, and further confirms that Licensor will no longer forbear in exercising the remedies
available to it under the License Agreement. Licensor will not permit the Pops' February 17-19
concert series "Get Up, Stand Up" to proceed unless the following conditions are met:

1. Payment to POKC in the amount of **$523,643.25**, received no later than **January 18,
   2023**. This represents the sum of the invoices incurred, plus the Ticket Philadelphia fees
   incurred, as reflected in the first two sections of the Statement attached hereto as Exhibit
   A; and

2. Advance payment of the estimated fees for "Get Up, Stand Up" to POKC in the amount
   of **$82,815.00**, received no later than **February 1, 2023**, as reflected in the third section
   of Exhibit A.

As we conveyed in our meeting on Friday, the Pops' Resident Company status has been suspended. If the conditions set forth above are not met by the stated deadlines, as noted above, Licensee will not be permitted to use the Kimmel Center facilities for the February 17-19 concert series, or for any other purposes. In addition, if the payments identified on Exhibit A are not paid in full by the deadlines indicated, please be advised of the following additional consequences:

- All remaining POPS events will be cancelled and dates held in the Kimmel Center for all activities by Philly Pops will be immediately released;

- Philly Pops performances will be removed from our website with a note that patrons should contact the Pops directly regarding their tickets. Language on each Pops performance display page located on the www.kimmelculturalcampus.org website will display, "This event has been cancelled, please contact Philly Pops administrative offices at 215.875.8004 for more information;"

- Philly Pops will be required to coordinate the removal of all their property currently stored in the Kimmel Center. Contact Ross Richards to make the arrangements; and

- All standing agreements with Garces Group for events around performances or Parkway for parking operations will be canceled.

Licensor reserves all other remedies available to collect the amounts due to Licensor under the License Agreement.

Sincerely,

*Mario Mestichelli*

Mario Mestichelli
Executive Vice President and Chief Financial Officer,
The Philadelphia Orchestra and Kimmel Center, Inc.


cc:     Jeffrey A. Leonard, Esq.

LEGAL\61114925\2 8888888/00800933

# EXHIBIT A

## STATEMENT

LEGAL\61114925\2 8888888/00800933

# Philly POPs Statement of
# Invoices, Fees and Estimates Incurred
# 10/1/22 - Current

Encore Series, Inc.
1518 Walnut Street, Suite 1706
Attention  Keith Obaza
Philadelphia, PA  19102

| Invoice: | | 1/11/2023 |
|---|---|---|
| Due: | 606,458.25 | Upon Receipt |
| Account: | | 0000012 |

*Customer Copy*

**POPS Statement**

| Order | Description | Units | Rate | | Charges |
|---|---|---|---|---|---|
| **Invoices Incurred from 10/1/22 - Current** | | | | | |
| | POPS Postage (October'22) - Invoice 27005 | 1.00 $ | 145.89 | / EA | 145.89 |
| | POPS Postage November'22) - Invoice 27123 | 1.00 $ | 1 77 | / EA | 1 77 |
| | POPs A Philly POPS Christmas - Invoice 27154 | 1.00 $ | 352,689.57 | / EA | 352,689.57 |
| | POPs Christmas Chior Holding - Invoice 27148 | 1.00 $ | 5,431.38 | / EA | 5,431.38 |
| | | | **Total Invoices Due** | | **$358,268.61** |
| **Actual Ticket Philadelphia Fees Incurred w.e 10/5/22 - w.e 12/27/22** | | | | | |
| | Ticket Philadelphia Fees | 1.00 $ | 165,374.64 | / EA | 165,374.64 |
| | | | **Total Fees Due** | | **$165,374.64** |
| **POPs Series #3 Advanced Payment Estimate** | | | | | |
| | 'Get Up, Stand Up' - Event #44269 | 1.00 $ | 82 815.00 | / EA | 82,815.00 |
| | | | **Total Fees Due** | | **$82,815.00** |
| **Statement Summary** | | | | | |
| | | | **Total Services** | | 606,458.25 |
| | | | **Total Taxes** | | 0.00 |
| | | | **Total Charges** | | 606,458.25 |
| | | | **Total Payments** | | 0.00 |
| | | | **Total Amount Due** | | 606,458.25 |

Please remit Check Payments to:

Kimmel Center, Inc
Attn   Accounts Receivable
300 S Broad Street
Philadelphia, PA 19102

Please remit ACH/Wire transfer to

Account Title   Kimmel Center  Inc
Bank Name   TD Bank
Bank Address. 121 S  Broad St. Philadelphia  PA 19107
Account #: 4305341200
Routing #: 036001808

# Exhibit 5

Sent from my iPhone

Begin forwarded message:

**From:** Frank Giordano <giordano.frank170@gmail.com>
**Date:** August 22, 2022 at 5:46:40 PM EDT
**To:** Dottie Giordano <dottie.giordano5@gmail.com>
**Subject: Fwd: STRICTLY CONFIDENTIAL**

Print

Sent from my iPhone

Begin forwarded message:

**From:** "Tarnopolsky, Matías" <MTarnopolsky@philorch.org>
**Date:** August 22, 2022 at 5:31:05 PM EDT
**To:** giordano.frank170@gmail.com
**Cc:** "Mestichelli, Mario" <MMestichelli@philorch.org>
**Subject: STRICTLY CONFIDENTIAL**


**STRICTLY CONFIDENTIAL**

Dear Frank,

It was good to see you today for lunch at the Union League.

Thank you for your openness to look at a new model for the Philly POPS's business relationship with the Kimmel Center (KCI). We have a joint opportunity to ensure that POPS's programming reaches and inspires the public as it has done for many years. However, as things currently stand, with around $500,000 total arrears to Kimmel and Ticket Philadelphia, we cannot allow the current season to proceed. We have been more than flexible and understanding, but, as you acknowledge, it is now time to do things a different way.

We discussed today that you would meet with your Board Chair and General Counsel to discuss a plan whereby The Philadelphia Orchestra and Kimmel Center Inc. (POKC), would take over the programming and production of this season, and future seasons, of Philly POPS programming. In this scenario, you will dissolve your board and organization, and you would – subject to our Board invitation and approval – join the board of POKC.

KCI and TP will continue to withhold all services (ticketing and venue) until POPS is either paid-up or other agreeable terms regarding a transition are settled upon. Unless we can arrive at terms quickly, this means cancelling the September 16, 2022 run of the Moody Blues in the absence of further payments.

We know there is demand, and a dedicated patron base, for pops programming, so this plan, whereby the POKC would program and present pops concerts utilizing the infrastructure of the POKC by engaging

the existing artistic, operational, and fundraising teams, ensures the audiences can still enjoy the performances as announced. While POKC cannot assume any obligations of ESI, we are willing to facilitate a collaborative, amicable and systematic transition so long as there is payment of all existing obligations.

We should also plan and agree all patron and public communications about this. The more unified we are in our statements, the more seamless this process will be from a public perspective also.

You are discussing this today with the ESI Board Chair and General Counsel; I have discussed with Mario and our Board Co-Chair. We have agreement to proceed to the next stage. Please can you respond to me and Mario as soon as reasonably possible with a proposed Memo outlining structure with an eye toward a mutually curated announcement at the POPS Ball currently scheduled for September 22, 2022, as you suggested. Mario is also on hand and is happy to work with you to draft the Memorandum.

I look forward to hearing from you soon. Always feel free to call my cell on 212 518 3977.

All best wishes,

Matías

Matías Tarnopolsky
President and CEO
The Philadelphia Orchestra and Kimmel Center, Inc
300 South Broad Street
Philadelphia, PA 19102
USA

Tel + 1 215 893 1961 | mtarnopolsky@philorch.org

philorch.org
kimmelculturalcampus.org

# Exhibit 6

# POPS Planning

**Participants (9/27/2022, 2:30P)**: Joseph Del Raso, Ryan Fleur, Frank Giordano & Mario Mestichelli

**Goal:** Plan for orderly wind down of ESI business without bankruptcy and seamless transition to POPS programming at POA next season. No POKC/POA/KCI assumption of liability/obligations.

**Outline:** Although the POKC may not assume any obligations of ESI d/b/a The Philly POPS, we would like to facilitate an amicable and systematic transition under certain conditions.

**Notes:**

*dedits*

1. Calendar
   a. Review calendar through the end of the current season to determine what programs remain and critical dates.
   b. Make no commitments beyond what has already been announced/committed.

2. Communication
   a. Coordinated communication with POKC approval as part of a potential (monetary) compromise.
      i. Review outstanding balances KCI and TP
   b. Internal communication with key staff.
   c. Communication with POKC & POPS Board
      i. Solicitation for support (fiduciary responsibility).
      ii. Approval of orderly wind-down plan with goal of dissolution presented to the POKC and approved by the ESI Board
      iii. Potential Board crossover/integration
      iv. Rebranding and marketing opportunities (discuss current sponsors)

3. Data Access
   a. Patron database access as part of a potential monetary compromise

4. Debt Repayment Plans
   a. Identify all outstanding debt and develop a plan for compromise/repayment (with timeline and source of funding)

5. Union Negotiations
   a. Coordinated with POKC/POA: transparency, good faith telegraphing intent and future expectations
   b. Agree on unified strategy for future POPS related musicians' relationships

6. Grantor/Donor Relations
   a. Identify outstanding grant obligations
   b. Pew and other grantors should be notified in advance and POPS should ensure grant requirements are met