UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ENCORE SERIES, INC., doing : 
business as THE PHILLY POPS, : Case No. 23-CV-01421-MRP
                             :
            Plaintiff, :
                             : Philadelphia, Pennsylvania
        vs. : July 26, 2023
                             : 11:02 a.m.
THE PHILADELPHIA ORCHESTRA AND :
KIMMEL CENTER, INC., ET AL., :
                             :
           Defendants. :
                             :
. . . . . . . . . . . . . . . . . . :

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE MIA R. PEREZ
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

For the Plaintiff:            William A. DeStefano, Esq.
                             Terri A. Pawelski, Esq.
                             Saxton & Stump
                             100 Deerfield Lane, Suite 240
                             Malvern, PA  19355

For the Defendants:          Steven A. Reed, Esq.
                             Zachary M. Johns, Esq.
                             Morgan Lewis & Bockius, LLP
                             1701 Market Street
                             Philadelphia, PA  19103

Court Recorder:              Mia Harvey
                             Clerk's Office
                             U.S. District Court

Transcription Service:      Jessica B. Cahill, CER/CET-708
                             Maukele Transcribers, LLC
                             467 Maukele Place
                             Wailuku, Maui, HI  96793
                             Telephone: (808)298-8633

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

|                                 | Page |
|---------------------------------|------|
| Plaintiff's Opening Statement   | 4    |
| Defendant's Opening Statement   | 7    |
| Plaintiff's Closing Statement   | 132  |
| Defendant's Closing Statement   | 137  |

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| **WITNESSES FOR PLAINTIFF:** |        |       |          |         |
| JOHN MEKO                |        |       |          |         |
| (By Mr. DeStefano)       | 17     |       |          |         |
| (By Mr. Reed)            |        | 37    |          |         |
| (By Mr. DeStefano)       |        |       | 80       |         |
| (By Mr. Reed)            |        |       |          | 92      |
| (By Mr. DeStefano)       |        |       | 93       |         |
| **WITNESSES FOR DEFENDANT:** |        |       |          |         |
| KAREN CORBIN             |        |       |          |         |
| (By Mr. Reed)            | 94     |       |          |         |
| (By Mr. DeStefano)       |        | 16    |          |         |

| EXHIBITS:               | Received |
|-------------------------|----------|
| Defendant's Exhibit 8   | 49       |
| Defendant's Exhibit 16  | 50       |
| Defendant's Exhibit 14  | 54       |
| Defendant's Exhibit 2   | 97       |
| Defendant's Exhibit 12  | 110      |
| Defendant's Exhibit 13  | 112      |
| Defendant's Exhibit 15  | 115      |
| Defendant's Exhibit 18  | 117      |
| Defendant's Exhibit 19  | 118      |
| Defendant's Exhibit 20  | 119      |
| Defendant's Exhibit 24  | 124      |

JULY 26, 2023                                    11:02 A.M.

2          THE COURT:  Before we begin today, I just want to make

3    sure that we're all on the same page.  We are here today to have

4    an evidentiary hearing based on Plaintiff's motion for a limited

5    preliminary injunctive relief that was filed on June 8th of 2023.

6    Specifically, that a relief the Plaintiff was seeking was to

7    reinstate The Philly POPS at Verizon Hall in the Kimmel Center

8    for Performing Arts for the upcoming 2023/2024 concert season.

9    And that would be pending a trial on the merits and the issues

10   before me.  Is that correct, gentlemen?

11         MR. DESTEFANO:  Yes, it is.

12         THE COURT:  Okay.

13         MR. REED:  Yes, Your Honor.  Thank you.

14         THE COURT:  Thank you very much.  So I believe we

15   should probably start with Mr. DeStefano since it is your burden

16   here today.  And specifically, we are looking at -- and I know my

17   staff  has spoken with you both with regards to what our focus is

18   here today for the purposes of this hearing; is that correct?

19         MR. DESTEFANO:  Yes.  Specifically, that is to address

20   the issue of irreparable harm if The Philly POPS was not put back

21   or reinstated in the Kibble Center Verizon Hall.

22         THE COURT:  That's correct.  So please -- and I would

23   just ask that you both use the microphones while you are

24   speaking.  I want to -- this is going to be recorded in lieu of a

25   physical stenographer.  And we find that sometimes voices are not

1  picked up and recorded properly if you're not speaking into the

2  microphone.  So gentlemen, if I interrupt to ask you to keep your

3  voice up, I mean no disrespect.  I just want to make sure we have

4  a solid record here.

5         MR. DESTEFANO:  Okay.

6         THE COURT:  Thank you.

7         MR. DESTEFANO:  Does the Court prefer a brief opening

8  statement before witnesses or just go right to the witnesses?

9         THE COURT:  I tend to allow you to run your case the

10  way you see fit, sir.

11                    PLAINTIFF OPENING STATEMENT

12         MR. DESTEFANO:  Your Honor, essentially it's the

13  Plaintiff's contention that the only way to avoid or address the

14  irreparable harm that has befallen or will befall Philly POPS is

15  to reinstate the Phillip POPS for a full concert season at

16  Verizon Hall.  And that would of course entail the ticketing at

17  as well, which is also controlled by the Plaintiff in this case.

18         And why is that so? Simply put, the evidence will show

19  that the Philly POPS is out of business, liquidated if it is not

20  allowed to perform for the 2023/'24 concert season.  That's far,

21  far, exceed its revenues, which right now are zero.  It is highly

22  insolvent.  It will not be able to redeem tickets, mostly season

23  tickets, but other tickets sold for concerts at Verizon Hall

24  during the 2022/'23 season, which as we state in our papers, was

25  abruptly cut short by the POPS' eviction from Verizon Hall.

1    And I can just give you a little flavor of the

2 evidence.  There's approximately $1.1 million dollars in tickets

3 that were sold.  They can be redeemed by performing makeup

4 concerts.  And to perform makeup concerts, the only available

5 venue would be Verizon Hall.  Indeed these tickets were sold for

6 Verizon Hall.

7    So a short version of the argument here is, and what

8 the evidence will show, is simply that the POPS is out of

9 business unless it's reinstated and will cease to exist as a

10 Philadelphia symphony orchestra.

11    Now, there's also a contention that we have is that the

12 goodwill of both of patrons, ticket holders, corporate sponsors,

13 and private and governmental contributors to be grant monies has

14 been severely damaged by the POPS ejection or eviction and

15 inability to perform.  And the only way to earn back the

16 credibility, the goodwill of its customers, is to continue

17 performing for this upcoming season in Verizon Hall.   Without

18 that, it will only deepen the example.  POPS has been advised

19 that by several corporate sponsors, good long time corporate

20 sponsors, Comcast, IBC, Parks Casino, and others which will be --

21 that we're sponsoring concerts.  And unless you're playing

22 concerts, there's nothing for us to sponsor.

23    Now, if they're reinstated, they'll be able to say,

24 okay, corporate contributor, we are performing concerts and we'd

25 like you to help sponsor.  So two areas of revenue, ticket sales

1 and contribution, which would include corporate sponsors, public

2 and private grants will have dried up and will dry up or

3 extinguish certainly if another year goes by or two or three or

4 whatever time it takes to adjudicate this somewhat complex

5 antitrust case.

6      Also, it's the musicians.  The evidence will show that

7 we could get the musicians back.  There's goodwill that has been

8 lost among the musicians because they haven't been paid.  Why

9 haven't they been paid?  They haven't been paid because there's

10 no revenue to pay them.  And no revenue to pay them is because

11 they're not able to perform concerts or obtain contributions.

12      If another year or two years goes by, I think the Court

13 can take judicial notice, you know, people come and go.  I mean,

14 will they ever be able to assemble that orchestra that's been

15 playing together for I'm going to say somewhere between 20 and 40

16 years into a POPS symphony orchestra if a year goes by or some

17 equally long or longer period goes by and they're not able to

18 perform?  So they must perform to stay in business.  And they

19 can't perform because the only available venue to them is Verizon

20 Hall.

21      So with that, I would like to call Mr. John Meko.

22      THE COURT:  But before we proceed --

23      MR. DESTEFANO:  Yes.

24      THE COURT:  -- since I did allow you the opportunity to

25 have an opening statement, I would also like to extend the

1  courtesy to Mr. Reed if he wishes at this time.

2          MR. DESTEFANO:  Oh, okay.  All right.

3          THE COURT:  To also -- please.

4          MR. REED:  Yes, Your Honor.  Thank you.

5          THE COURT:  Thank you.

6                  DEFENDANT'S OPENING STATEMENT

7          MR. REED:  Your Honor, Steven Reed on behalf of the

8  Defendants.  I'm going to do something a little bit different

9  than I planned if you'll indulge me.  I think it might make sense

10 for me to kind of lay out our position as you invited.  And also,

11 put some documents in front of you that I intend to go through

12 with the witnesses so you can kind of get some -- put some meat

13 on the bones if you will.  So with your permission, I have a

14 binder for your clerk and for you.

15         THE COURT: Please. Thank you.

16         MR. DESTEFANO:  I'm going to object to these documents.

17 I've looked at them.   And my objection, Your Honor, is they're

18 not relevant to the narrow issue of irreparable harm.  They go to

19 other issues, probability, success on the merits, or likelihood

20 that maybe some other greater harm befalling one party or the

21 other.  But they are -- at least I thought the Court was very

22 emphatic that this hearing would be limited to irreparable harm

23 if the POPS was not put back into Verizon Hall.  And that the

24 other issues need not be addressed at this hearing.

25         THE COURT:  Here's what -- I was very clear about that.

1  And what we'll do, Mr. Reed, since you have these documents,

2  they'll remain with my clerk until you lay the proper foundation

3  with whatever witness is available here today as to where they

4  would fall in specifically with the irreparable harm component.

5          MR. REED:  Absolutely, Your Honor.  I'm happy to tie

6  these documents precisely to that issue.  In terms of foundation,

7  Your Honor, I just want to make sure that we're meeting your

8  expectations.  This is something that I discussed with Mr.

9  DeStefano before coming in this morning.  I think the law in the

10 Third Circuit is clear that you have discretion that the Federal

11 Rules of Evidence don't need to apply, be applied with particular

12 rigor in this context.  You can consider what might otherwise be

13 subject to a hearsay exception.

14         MR. DESTEFANO:  I don't agree with that, but yeah.

15         MR. REED:  Your Honor, if I could finish please.  To

16 the extent that we need to lay a foundation, I'm happy to do

17 that.  It will take more time with the witnesses, but I'm happy

18 to do that, but I don't think you're required.

19         THE COURT:  I understand that.  Unfortunately, I tend

20 to be a stickler for the rules of evidence.

21         MR. REED:  Right.

22         THE COURT:  And proper foundation should be laid with

23 the witness.

24         MR. REED:  Happy to address that.  I just would point

25 you to the Third Circuit's decision, Koh, K-O-H, which says it's

1    not necessary --

2              THE COURT:  Understood.

3              MR. REED:  -- and I will follow your lead.

4              THE COURT:  Thank you.

5              MR. REED:  So I will focus on the question that you

6    asked us to address at this hearing.  And to do that, the first

7    step is to focus on the right standard that must be applied.

8              This is -- and it's clear, the record is I don't

9    believe in dispute, but I'll point you to the documents.  The

10   contract that the POPS once had with my clients has expired.  It

11   expired on June 30th of this year.  You'll see that in tab, when

12   we're ready, Tab 2 of the binder before you.  But the point is

13   there was a 2018 license agreement that had a five-year term that

14   expired on June 30.

15             So as such, what the POPS is looking for you to do is

16   enter a mandatory injunction.  Not one that maintains the status

17   quo, but one rather that requires my clients to do something

18   differently than they obligated to do now.

19             And there's a heightened standard, and it's a really

20   important point, Your Honor.  So I want to make sure that I'm

21   very clear on it.  This is a mandatory injunction and the

22   standard that has to be applied is articulated in the Hope

23   decision.  It's a Third Circuit decision from 2020.  It's cited

24   in our briefs.  And it says that mandatory injunctions require

25   the movant to meet a heightened standard among other things.

1    When we talk about irreparable harm, which is the focus of the

2    hearing today, there must be a clear showing of immediate harm.

3    That clear showing of immediate harm that comes out of another

4    Third Circuit decision, that's the Hohe, H-O-H-E.  It's a little

5    bit confusing.  We have Hope and Hohe, but H-O-H-E, that's a 1989

6    Third Circuit decision.  Again, you'll find the full cite in your

7    briefs, but I'm happy to provide a pin site if you need it.

8           Again, I'll focus on that standard.  A clear showing of

9    immediate harm.  So first of all, the evidence will show, and the

10   briefs certainly failed this standard.  The POPS have not made a

11   clear showing of harm.  If you look at their papers, what they

12   filed with Your Honor, the motion referred simply to a statement

13   that said they would be forced to consider bankruptcy.  That's

14   all they said.  Those were their moving papers.  That was their

15   assertion.  We cited the Third Circuit for Instant Freight

16   decision.  That one's an '89 decision as well, 1989 cited in our

17   papers.  It says merely considering bankruptcy is not enough to

18   establish that standard.

19          Now in their reply brief, they describe the harm

20   differently.  Then they said two things.  They said they're

21   highly likely to be unable to perform concerts.  And two, they

22   talked about loss of reputation, which you heard from Mr.

23   DeStefano this morning.  Again, they didn't say the bankruptcy

24   was imminent, that they were highly insolvent or anything like

25   that.  They said highly likely not to be able to perform

concerts.  So it's a bit of a moving target.  And so, hopefully

Mr. DeStefano will come forward with some evidence.  But right

now he hasn't.  He's had argument and his argument has been both

inconsistent and is insufficient under the law to meet their

standard.  It just is. You know, and they need facts.  They don't

need assertions.

They also have to show, Your Honor, that harm would be

immediate.  Again, they haven't made that showing at all.  In

fact, you have to wonder about the long delay that they've so

far, right?  So they point back to the suspension of their status

as a resident company at the Kimmel Center, which occurred back

in January.  So now they wait six months to June to file their

motion.  Then they're saying, well, we're barely forced to

consider bankruptcy.  And they're asking for relief that's into

the future into September.

So I think case after case we cited some of them.

We'll tell you that that kind of inaction really undercuts their

contention that this harm that they're concerned about is

immediate to begin with.

But they also Your Honor and the facts will show this.

They have -- can't show, haven't shown and can't show that the

relief they seek is necessary for them to avoid the harm. There

are multiple venues in this region and beyond where they can

perform.  If their goal is to make money by putting on

performances, if their sponsors will only sponsor them if they

1    perform, they're free to do that elsewhere.  Yes, they've done it

2    in the past at Verizon Hall and the Kimmel Center, but if you

3    look at -- and this Tab 24 of your binder.  If you look at their

4    website, what they describe about, say about themselves, and they

5    frankly say this in more than one place, they do in press

6    releases as well, they'd say POPS is the principal orchestra of

7    Met Philadelphia.

8              They go on to say that POPS performs at venues

9    throughout the mid-Atlantic region.  They don't say we only play

10   at Verizon Hall.  We can only play at Verizon Hall.  They're out

11   there advertising.  In fact, we know they do.  And we'll put on

12   evidence of that.  You might even take judicial notice of the

13   fact that The POPS performed outdoor/indoor.  You'll hear more

14   about The Met Philadelphia. It actually has a bigger seating

15   capacity than Verizon Hall.  If they're looking to perform

16   somewhere, there are places where they can go if they're willing

17   and able to pay.

18             That's been the problem with us.  No doubt it might be

19   a problem for others.  They'll want to be paid too, but that

20   doesn't mean they get to -- we have to be forced to accommodate

21   them and foot the bill because others won't -- aren't willing to

22   do that.

23             And if you look, and you heard Mr. DeStefano talk about

24   tickets that were sold for Verizon Hall that were not performed,

25   well one of them notably was this Get Up, Stand Up concert.  That

1    was one that was scheduled to occur in February.  And again, if

2    you look at their website, if you look their press releases, the

3    rescheduled that to be held at The Met Philadelphia.  And they

4    were going to honor tickets sold for that concert at The Met

5    Philadelphia.  Seating capacity exceeds what's in Verizon Hall.

6          Now, that concert didn't go forward.  Maybe we'll hear

7    today why that didn't go forward at Met Philadelphia.  But the

8    point is, even -- look, we're all sympathetic to the ticket

9    holders who paid money to see concerts.  It's unfortunate that

10   POPS haven't been able to meet their obligations, haven't been

11   paying their bills. But it's not accurate to say that the only

12   place that they can put on those performances is Verizon Hall.

13   It's just not true and they don't have the legal right to do

14   that.

15         So the relief that they're seeking from you is not

16   necessary to avoid the irreparable harm that they're claiming,

17   which is one of the requirements under the law.  Your Honor, it's

18   also, the relief is also not sufficient to set to avoid the harm.

19   You heard it this morning.  They are way, way in debt according

20   to Mr. DeStefano.  Maybe we'll see some evidence of that.  But

21   assuming that's the case, we heard they sold over a million

22   dollars of tickets that they haven't paid.  This amount is in

23   dispute.  But we contend they owe us a million dollars for past

24   performances, including the last Christmas season they performed,

25   which they never paid for.  They also -- they're in a lawsuit

1  with their musicians.  They owe --

2          THE COURT:  Mr. Reed.

3          MR. REED:  Yeah?

4          THE COURT:  I want to be careful.  These are opening

5  statements.  So I'm going to give you a chance to sum up after we

6  have evidence, but some of these are definitely touching on what

7  I expect to be -- hear from the witness's mouth.

8          MR. REED:  Your Honor, I will keep it short.  I

9  appreciate the reminder.  I just wanted to give you a preview of

10  what you're going to hear.

11          THE COURT:  I appreciate advocacy, but I want to make

12  sure we're focused on the opening.

13          MR. REED:  But in any event, so just the opening

14  argument on that point is it's not sufficient because they can't

15  make money and they don't have musicians to perform.  Simply put.

16  None of the cases that they cite, and they only cite a couple on

17  this issue.  One is Tasty Baking.  The other is Group ASEB

18  (phonetic) support their case.  I can address that at closing.  I

19  can address that at closing.  But they don't have case support.

20  They can't point to another case where -- on these facts where a

21  court entered a mandatory injunction like here.  Tasty Baking was

22  a hold separate.  It was actually specifically to maintain the

23  status quo when competitors were combined and completely

24  different set of facts and circumstances than here.

25          And let me just -- then I'll just wrap up and make the

point.  I realize that we're focused on the irreparable harm

element, one of four elements that they are required to satisfy.

But there's a reason why courts obviously must also consider

likelihood of success.  And that's because, well, The POPS may

have a need to use our hall.  They may want to use our hall.  The

key point is they don't have the right to use our hall.  And that

goes right to the insufficiency.  They have to prove a clear

likelihood of a success.  It's a heightened burden again because

of the mandatory injunction.  We addressed that in our papers.

And if you permit me, I'll address it later in closing, but I'm

not going to get into it now.

        THE COURT:  Much appreciated.  Thank you, sir.

        MR. REED:  Thank you, Your Honor.

        THE COURT:  First witness please, Mr. DeStefano.

        MR. DESTEFANO:  Yes.  John Meko, please.

        THE CLERK:  Please raise your right hand.

        <u>JOHN MEKO, PLAINTIFF'S WITNESS, SWORN</u>

        THE CLERK:  Thank you.  Please state your full name and

spell your last name for the record.

        THE WITNESS:  John Meko, M-E-K-O.

        THE CLERK:  Thank you.

        THE COURT:  Good morning, sir.

        THE WITNESS:  Good morning.

        MR. DESTEFANO:  Before I examine Mr. Meko, I want to

just for the record place an objection here.  I mean, it was our

1    clear understanding that this hearing would be strictly limited

2    to the irreparable harm element.  And frankly because of that, I

3    did not come prepared to address likelihood of success on the

4    merits, public interest, or any of the other elements.

5         Therefore, I object to Mr. Reed arguing at the podium

6    or getting into evidence that goes to factors other than the

7    irreparable harm if The POPS is not placed back into Verizon Hall

8    on a temporary basis pending adjudication of this case.  So you

9    know, I apologize.

10        THE COURT:  That's fine.  I understand that and your

11   objection is sustained.  Quite frankly, I did ask for

12   specifically for us to focus on the irreparable harm based on the

13   filings from both sides.  That is where this Court is finding the

14   issues beyond the threshold.  We are not -- we have some wiggle

15   room on whether or not we get through that gateway.

16        MR. DESTEFANO:  Right.

17        THE COURT:  Right?  And the caselaw says I need to be

18   focused on the first two factors, success on the merits and

19   irreparable harm.

20        MR. DESTEFANO:  Right.

21        THE COURT:  Right?  I've heard the arguments contained

22   in your briefs with regard to success on the merits.  They've

23   been noted Mr. Reed.  My concern is irreparable harm and that's

24   where I find the most salient issue between the two of you that I

25   need to suss (sic) out to get through that gateway.

DIRECT EXAMINATION

BY MR. DESTEFANO:

Q    All right.  What -- are you a current board member of The Philly POPS?

A    I am.

Q    Okay.  And could you tell us what committees of the board that you are a member of or the chairman of?

A    I'm the Chair of the Finance Committee, the Treasurer, and previously was Chair of the Development Committee.

Q    Okay.  Now, I take it the Management Committee assists in managing or supervises the management of the Philadelphia POPS Orchestra?

A    Yes.

Q    Okay.  The Development Committee does what, sir?

A    Fundraising.

Q    Okay.

A    Voluntary contributions.

Q    And that would both be private and public contributions?

A    Foundations, individuals, public, yes.

Q    All right.  And for how long have you been engaged in development activities on behalf of The POPS?

A    Twelve years or so, something like that.

Q    How long have you been a board member?

A    About the same time.

Q    Okay.  The Finance Committee deals with the finances of the

1  Philadelphia POPS?

2  A    Correct.

3  Q    Okay.  Let me go back a little bit.  Do you have any other

4  jobs while also serving on the board of the Philly POPS?

5  A    It's a volunteer position.

6  Q    Okay.

7  A    So yes, I'm the Executive Director of the Union League

8  Legacy Foundation.

9  Q    Okay.  And executive director I take it, supervises all

10 aspects of the Union League Legacy Association?

11 A    Correct.

12 Q    Including fundraising, including finances, including

13 whatever else happens.  How long have you been engaged in that

14 job?

15 A    Seventeen years.

16 Q    Okay.  Now, prior to your job with the Union League Legacy

17 Fund, what did you do?

18 A    I was at the Academy of Natural Sciences where I was Vice

19 President for Marketing and Development. And then previously a

20 variety of other nonprofit organizations.

21 Q    Okay.  And when did you graduate from college?

22 A    1990.

23 Q    Which college?

24 A    La Salle University.

25 Q    What's your degree in?

A     Finance.

MR. DESTEFANO:  Your Honor, on the basis of that foundation, I'd like to offer Mr. Meko to the Court as an expert witness in the charitable 501(3)(c)(sic) corporations.

MR. REED:  Your Honor, I object.

THE COURT:  Basis?

MR. REED:  Well, many.  One was there was no disclosure of expert witnesses in this case.  Your chambers asked for disclosure witness.  We had agreement with Mr. DeStefano that we would disclose the witnesses we intended to call.

MR. DESTEFANO:  We spoke, Mr. Reed?

THE COURT:  Hold on.  Mr. DeStefano, let be very clear about my courtroom.

MR. DESTEFANO:  Yeah, I won't interrupt.

THE COURT:  Thank you.  I don't allow interruptions. You are speaking to the Court, not each other.  Please, gentlemen.  Mr. Reed?

MR. REED:  Thank you, Your Honor.  So had we been informed that they intended to offer an expert witness, we might have brought our own expert witness.  I also question the witness's expertise.  If necessary, I'd like to conduct a short voir dire.  But I don't think he's appropriately presented to you as an expert witness in this hearing.

THE COURT:  I'm not sure how you're -- Mr. Meko, with all due respect, Mr. Meko is going to fulfill the criteria for an

1    expert witness under the rules of evidence, sir.

2            MR. DESTEFANO:  Well, under the rules of evidence, a

3    person can be qualified to give opinion testimony as an expert by

4    experience, by education, or some combination of those.  This

5    person has a degree in finance.  He's been the executive director

6    and/or working for on a voluntary basis in the case of POPS, but

7    also on a paid basis of nonprofit corporations for his entire

8    career after graduation from college. I would say he has the

9    requisite experience.  I would say that for matters of financing,

10   he has a bachelor's degree in finance and has years of experience

11   in financial matters, both as the executive director or voluntary

12   finance committee chair of Philly POPS.

13           It's not like he's been doing it for two or three or

14   four or five years.  It looks like he graduated from college in

15   1990. He's been doing this sort of work for 20 some odd years.

16   So I think he does qualify.  I disclosed Mr. Meko along with what

17   he does and his occupation and what his positions are.  There

18   was, I think, aside from the Court's request to give the Court a

19   list of witnesses and how long it would take, et cetera, et

20   cetera. There was no obligation. The Court imposed no obligation

21   to disclose any witnesses or documents.  We did it on a voluntary

22   basis.  And on a voluntary basis, we disclosed Mr. Meko.

23           THE COURT:  Thank you.  Your objection is sustained.

24           MR. REED:  Thank you, Your Honor.

25   /////

BY MR. DESTEFANO:

Q     All right.  Mr. Meko, has The POPS looked, searched for other venues in the greater Philadelphia area once it became aware that it was being evicted from the Verizon Hall?

A     We had been -- yes, yes.

Q     And has The POPS been able to find any suitable venues for the performance of a series of symphony concerts?

A     Not for subscription concerts, no.  Series as you say.

Q     And why is that, sir?

A     So our subscription patrons are -- had been at Kimmel or the Academy or that block forever sine the POPS founding.  And that's what they are used to.  That's what our audience is looking for.  There are all kinds of reasons from an audience perspective.  We did, as was mentioned, try to move to The Met and it was a disaster.

Q     How was it a disaster?

A     We sold approximately $5,000 in tickets.  We had angry patrons that were refusing to even consider going there.  They had been going to the Kimmel forever.  They bought tickets for the Kimmel, and it did not work.

Q     Was there scheduling availability?

A     There was, but it was difficult.  And, you know, our standard Sunday shows could not happen at The Met for example, so it was difficult.

Q     Do you know of any other suitable venue for performance of

1    symphony concerts other than Verizon Hall?  And again, in the

2    Philadelphia metropolitan area?

3    A    Not for the subscription concerts.  We have done other one-

4    off concerts of various types.  But not for subscriptions, no.

5    Q    What makes the Verizon Hall at the Kimmel Center, in your

6    view, the only place for the performance of symphony concerts on

7    a series basis rather than a one-off basis?

8         THE COURT:  Mr. DeStefano, I'm going to ask that you

9    allow the witness testify versus you.

10         MR. DESTEFANO:  I will.

11         THE COURT:  Thank you.

12         THE WITNESS:  Well, Kimmel Center, Verizon Hall was

13   built for the subscription concerts.  It's location -- it's other

14   facilities -- for example, The Met has a stage that's barely

15   adequate and nothing else.  For example, there's no place for a

16   choir, which is essential to many of the concerts that we do.

17   You know, the Kimmel Center was built for Philly POPS and like

18   orchestras to perform there.  And there's nothing else in terms

19   of location or facilities in the region that can sustain

20   subscription concerts in the numbers and on the dates and in

21   location.

22   BY MR. DESTEFANO:

23   Q    And when you use the term subscription concerts, please

24   explain to the Court exactly what you're talking about.

25   A    So The POPS subscription series, are a series of concerts

1   that are typically three concerts.  Friday, Saturday, Sunday

2   concerts that are at Kimmel.  And subscribers subscribe for

3   typically the entire run of the season, so that's a subscription.

4   Q    Okay.  Does the POPS or has the POPS historically put on

5   what's been referred to as Christmas concerts?

6   A    Yes.

7   Q    And please explain what those are?

8   A    So they are not subscriptions in the same way.  They are

9   concerts that are at Kimmel typically that are ten or so concerts

10  at the Kimmel Center.  They are not part of subscription series.

11  Individuals buy tickets.  Subscribers often buy tickets, but

12  they're not part of the series.

13  Q    Okay.  Is there any place else in Philadelphia or the

14  Philadelphia metro area where the POPS would be able to play

15  their Christmas series of contents.

16  A    We did do one show at The Met, I believe, a couple years

17  ago.  It was the -- I believe Salute series, so it wasn't part of

18  a ticketed kind of series.  It did not go well from a production

19  standpoint and other things.  So no, in my opinion there's no

20  place else to go.

21  Q    Does The Met have a choir loft of facilities for a choir or

22  an organ?

23  A    They do not.

24  Q    Are those types of facilities necessary for the Christmas

25  show?

1    A    The Christmas show, absolutely.

2    Q    Christmas shows?

3    A    Shows.

4    Q    Okay.  I take it pursuant to your duties with the board of

5    directors of The Philly POPS, you are familiar with the Philly

6    POPS' financial position?

7    A    I am.

8    Q    Okay.  Does The Philly POPS have accounts payable and/or

9    debts?

10   A    We do.

11   Q    And what are the magnitude of those debts?

12   A    So they're close to $2 million dollars in various debts to

13   vendors and others, $1.1 million dollars in tickets that we need

14   to, you know, that are -- we need to perform to redeem.  And then

15   as was mentioned, some amount for Kimmel Center Philadelphia

16   Orchestra.

17            THE COURT:  I'm sorry, I just want some clarification

18   here.  You said there's approximately $2 million in debts to the

19   vendors.  And is that $1.1 million on top of the $2 million?

20            THE WITNESS:  Correct.  It's about -- it's probably

21   close to $2 million dollars.  There's some dispute among some of

22   those.  So I think if we took out the disputed amounts, it would

23   probably be about 1.7.  But there are disputed amounts.  And then

24   1.1 in tickets.

25            THE COURT:  Thank you.

1    BY MR. DESTEFANO:

2    Q    Okay.  Without playing concerts, does the POPS have any

3    source of revenue?  Do you have money in the bank?

4    A    No.

5    Q    Okay.

6    A    We do have small amounts of grants for educational programs

7    that we do.

8    Q    But they're earmarked for educational programs?

9    A    Correct.

10   Q    All right.

11   A    Correct.

12   Q    All right.  But aside from that, does the POPS have any

13   money with which to pay its debts or accounts receivable?

14   A    Nothing material.

15   Q    Okay.  Is the POPS insolvent at this point in time?

16   A    Yes.

17   Q    All right.  Would it be accurate to say that it's grossly

18   insolvent?

19            MR. REED:  Objection, Your Honor.

20            THE COURT:  Sustained.

21   BY MR. DESTEFANO:

22   Q    So at present, can the POPS continue its business either on

23   a limp along basis or whatever without being put back into

24   Verizon Hall?

25   A    The Philadelphia --

1          MR. REED:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    BY MR. DESTEFANO:

4    Q    Well, based upon your assessment of the financial position

5    and your experience and skill in financial matters, both with

6    respect to the POPS and other things, and your perception, sir,

7    what is your opinion as to whether or not the POPS can continue

8    its business?

9          MR. REED:  Objection, Your Honor.

10         THE COURT:  Sustained.  He has not been qualified as an

11   expert.

12         MR. DESTEFANO:  He can give a lay opinion, Judge, under

13   the rules as long as it's based upon perception, facts that he

14   perceives.

15         THE COURT:  Counsel?

16         MR. REED:  Objection, Your Honor.

17         THE COURT:  Sustained.

18   BY MR. DESTEFANO:

19   Q    Are you familiar with the term involuntary bankruptcy?

20   A    I am.

21   Q    What does that mean to you, sir?

22   A    That those that you owe money to would force you into

23   bankruptcy.

24   Q    Do you believe that there is a substantial likelihood that

25   that will happen without being able to perform concerts at

1  Verizon Hall for at least the upcoming season?

2  A     Yes.

3  Q     Without being placed into Verizon Hall or reinstated at

4  Verizon Hall, would the POPS be able to obtain enough money not

5  just to pay its debts but to fund a plan of reorganization?

6           MR. REED:  Objection, Your Honor.

7           THE COURT:  I'm going to ask you to rephrase that.

8  Sustained, but please rephrase, Mr. DeStefano.

9           MR. DESTEFANO:  Okay.

10 BY MR. DESTEFANO:

11 Q     Based upon your knowledge of the financial condition and

12 based upon your testimony that there's no place else to play,

13 would the POPS be able to raise money if not allowed to perform

14 at Verizon Hall going forward?

15 A     No.

16          MR. REED:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  No.  I don't see how we can raise money

19 from our corporate sponsors and friends, from our individual

20 sponsors in any significant degree without getting in and

21 performing as the Philadelphia POPS Orchestra, let alone from our

22 friends in the public sphere who are wanting to help us.  But

23 it's really contingent on performing at the Kimmel Center.

24 BY MR. DESTEFANO:

25 Q     In connection with your activities or development activities

1  on the development committee, which you are chair of, do you have

2  contact with actual and potential corporate sponsors?

3  A    Yes.  To be clear, I was former chair of development.  I'm

4  not currently the chair.

5  Q    Okay.

6  A    But yes, I do.

7  Q    All right.  And have you asked your corporate sponsors to

8  sponsor the POPS going forward in the absence of any

9  performances?

10 A    No, because that would be an absurd ask.

11 Q    What do your corporate sponsors sponsor?

12 A    The concerts at Kimmel, for the most part.  The vast

13 majority of them are sponsoring concerts at the Kimmel Center.

14 Q    If the POPS is allowed to perform a series of concerts at

15 the Kimmel/Verizon Hall, do you believe that you can get some

16 sponsorship money?

17 A    Yes.

18 Q    And is that based upon your past experience?

19 A    Yes.

20 Q    And also your conversations with the corporate

21 sponsors -- historic corporate sponsors?

22 A    Yes.

23           MR. REED:  Objection, Your Honor.  He's leading the

24 witness.

25           THE COURT:  Sustained.

1    BY MR. DESTEFANO:

2    Q    Can you list for us who your corporate sponsors historically

3    have been?

4    A    Sure.  Comcast, Citizen's Bank, Bank of America, IBX,

5    Haverford Trust, Giant Foods.  Forgive me, there are others.

6    Q    Okay.  And is there any chance or prospect of getting them

7    to sponsor the Philly POPS without the Philly POPS being able to

8    play concerts?

9         MR. REED:  Objection, Your Honor.  He's asking the

10   witness to speculate.  He hasn't built the foundation.

11        MR. DESTEFANO:  I think there is a foundation.  He

12   spoke to these people.  He's been in the development and

13   fundraising business a long time.

14        THE COURT:  Well, that part is speculation.  Whether or

15   not he's actually had conversations with these sponsors is

16   something different.  So you need to lay a foundation before I'll

17   allow that in.  Sustained.

18        MR. DESTEFANO:  Yeah.  Yeah.

19   BY MR. DESTEFANO:

20   Q    Have you had conversations with any of these sponsors?

21   A    Yes.

22   Q    And as a result of those conversations, I'll ask the

23   question again, do you believe that there's a prospect of getting

24   sponsorship if --

25   A    Yes.  If we can get back in --

1   Q    -- if you can get back into Verizon Hall?

2   A    -- then we can get sponsorship from at least several of

3   those.

4   Q    Are you familiar with the availability and the historic

5   public and/or private grants or contributions that the POPS has

6   been able to obtain --

7   A    Yes.

8   Q    -- over the years that you've been involved in this?

9   A    Yes.

10  Q    Have you spoken with or been advised of conversations or

11  efforts to obtain those grants recently --

12  A    Yes.

13  Q    -- since eviction?

14  A    Yes.

15  Q    And on the basis of that, do you believe that any of those

16  grants will be forthcoming if the POPS cannot or is not in the

17  business of playing concerts at Verizon Hall?

18  A    I -- I don't see how we can get any of that funding in any

19  substantial way without performing in the Kimmel Center.

20  Q    Okay.  And is there anything else you can do that people are

21  willing to pay tickets for but perform concerts?

22  A    No.  I mean, our -- our ticketing is entirely for people

23  paid for the concerts.  That's it.

24  Q    Will the POPS be able to repay or redeem the tickets already

25  sold without the ability to perform concerts going forward at

```
 1   least for the '23/'24 season at Verizon Hall?
 2   A    No.
 3   Q    Let's talk about musicians.  I think Mr. Reed raised the
 4   issue of musicians.  First of all, are you at least an amateur
 5   musician?
 6   A    I am?
 7   Q    How about your dad?
 8   A    Dad was a -- we're trumpet players.
 9   Q    How about your son?
10   A    He's a trumpet player.
11   Q    So you have some familiarity with musicians.  And have you
12   dealt with musicians that had been assembled to play for the POPS
13   going back a number of years?
14   A    I know some of them.
15   Q    All right.  All right.
16   A    I've had no direct contact with any of the negotiations with
17   the orchestra, anything like that.
18   Q    Okay.  All right.  Do you believe that you will have any
19   problem assembling musicians in order to play at the Verizon Hall
20   if you're reinstated and you come up with a schedule of concerts?
21             MR. REED:  Objection, Your Honor.
22             THE COURT:  Sustained.  You need to lay a foundation
23   for that, sir.
24   BY MR. DESTEFANO:
25   Q    Have you lost goodwill with your musicians?  You meaning
```

1   Philadelphia POPS.

2   A    Yes.

3   Q    How so?

4   A    We haven't been able to perform.  These are musicians that

5   many of them, this is a large of their livelihood.  This is what

6   they do.  And we have not been able to get back into Kimmel and

7   perform.  So yes, of course, that's a loss of goodwill.

8   Q    And do you owe the musicians money from the last few

9   performances or from any other activity that they've done on

10  behalf of the POPS that you're not able to pay, given your

11  current financial ability?

12  A    There's an amount dispute, but I'm not involved in the

13  details of that.

14  Q    Okay.  But you know there's a number in dispute --

15  A    Yes.

16  Q    -- that you owe the musicians?

17  A    Yes.

18  Q    All right.  Will you be able to pay that amount?

19  A    No.  No.

20  Q    Unless you're put back into the POPS?

21  A    No.

22  Q    Would reinstatement in the POPS facilitate or enable the

23  POPS to pay the musicians what's owed and life goes on?

24  A    I would hope so.

25  Q    So to recap, sir, is it correct that you have lost goodwill

1   with your musicians, with your corporate sponsors, and with your

2   ticket holders or patrons?

3           MR. REED:  Objection, Your Honor.

4           THE COURT:  Sustained.

5   BY MR. DESTEFANO:

6   Q    Knowing what you know about the financial condition of the

7   POPS, and knowing what you know about the dealings with ticket

8   holders, musicians, and patrons, customers -- grants, do you

9   believe you have a prospect of regaining that goodwill with all

10  three entities if you were put back into the Verizon Hall to

11  perform concerts during at least the '23/'24 season?

12          MR. REED:  Objection, Your Honor.

13          THE COURT:  Sustained.

14  BY MR. DESTEFANO:

15  Q    Do you believe there is any prospect of recouping the lost

16  goodwill without being able to perform concerts?

17          MR. REED:  Objection, Your Honor.

18          THE COURT:  Overruled as to that one.

19          THE WITNESS:  Based on my relationship with many of our

20  corporate donors, our other individual donors, and my

21  understanding of where we are with patrons, I don't -- I don't

22  see how.  No.

23  BY MR. DESTEFANO:

24  Q    With musicians, you mean?

25  A    Musicians or any -- any of those.  Any of those groups.

1  Q    Do you know whether the Kimmel Center and/or POKC are

2  non-profit corporations?

3  A    They are.

4  Q    And are they qualified charitable under 501(c)(3)?

5  A    As far as I'm aware, yes.

6  Q    And is the POPS likewise?

7  A    Yes.

8  Q    Does the POPS have any other source of revenue other than

9  charitable contributions, corporate sponsorships, and ticket

10 sales?

11 A    No.  Nothing material.

12 Q    Can you tell us your belief as to why the Kimmel Center at

13 Verizon Hall is the only spot or venue to play symphony orchestra

14 concerts?

15      MR. REED:  Objection, Your Honor.  Misstates the

16 testimony and is leading.

17      MR. DESTEFANO:  It doesn't misstate the testimony.  And

18 can you tell us is not leading.

19      THE COURT:  Mr. DeStefano?

20      MR. DESTEFANO:  Yes?

21      THE COURT:  Rephrase it.

22      MR. DESTEFANO:  All right.

23 BY MR. DESTEFANO:

24 Q    You testified earlier that there's no other suitable

25 available venue other than the Kimmel Center for the POPS to play

1   going forward after having been evicted.

2           THE COURT:  Just so we're clear, I believe that Mr.

3   Meko's testimony was for a subscription, on a subscription basis.

4           MR. DESTEFANO:  Right.

5           THE COURT:  So let's be very clear here.

6           MR. DESTEFANO:  I think he also said the Christmas

7   concerts, as well.  But --

8           THE COURT:  He specifically stated the Met was not an

9   option for the Christmas concerts.  So let's be very specific as

10  to what his testimony was.

11          MR. DESTEFANO:  Okay.

12  BY MR. DESTEFANO:

13  Q   Well, let me ask you, then, yeah, is there anything other

14  than the Met or --

15  A   Not to my knowledge.  For Christmas, no.

16  Q   Yeah.

17  A   No.

18  Q   Yeah.  Why is that so?

19  A   Well I mean, the Kimmel Center was literally built for these

20  concerts, for the Philadelphia Orchestra.  Verizon Hall was built

21  for the Philadelphia Orchestra, the Philly POPS.  That's why it's

22  built.  And it's a great venue for that.  There's nothing else

23  like that in the Philadelphia region.  That's why it exists.

24  Q   Do you know of anybody, any venue that has the proximity of

25  restaurants and/or parking close by?

1  A    No.

2  Q    How about the Met?

3  A    No.  It's nothing like that.

4  Q    In your development efforts, is the proximity of indoor

5  parking and restaurants an important factor in selling tickets

6  and --

7  A    Yes.  Yes.

8  Q    And why is that?

9  A    Well, our corporate sponsors want to be in Center City.

10  They want to -- you know, the way that it's structure, there's

11  entertainment for customers involved in that.  And so it's all

12  kind of one package.  And that package doesn't exist anywhere

13  else.

14  Q    You testified that you've lost goodwill with various

15  constituencies as a result of being -- not being able to play at

16  Verizon Hall.  Is there any way that you can put a dollar sign on

17  the injury that results in either of those constituencies, the

18  loss of that goodwill?

19  A    I don't know how to put a dollar sign on that kind of

20  goodwill, no.

21  Q    Would you say that the loss of goodwill is substantial?

22  A    Yes.

23  Q    Knowing what you know and being familiar as you are with the

24  financial condition of the POPS at present, without being

25  reinstated, would the POPS be forced to shut down?

```
 1   A    I think as the Philadelphia POPS Orchestra, I don't think

 2   there's any way forward without getting back in Kimmel.

 3             MR. DESTEFANO:  That's all I have on direct, Your

 4   Honor.

 5             THE COURT:  Thank you.  Mr. Reed.

 6             MR. REED:  Your Honor, may I approach the witness?

 7             THE COURT:  Please.

 8                        CROSS-EXAMINATION

 9   BY MR. REED:

10   Q    Good afternoon, Mr. Meko.

11   A    Good afternoon.

12   Q    I've handed you a binder of documents that I might refer you

13   to, but we'll decide as we go along.  So I appreciate your time

14   and your testimony today.  So Mr. Meko, you're a volunteer at the

15   POPS?

16   A    I am.

17   Q    Have you ever been an hourly employee?

18   A    No.

19   Q    Roughly how many hours a day do you spend on POPS business?

20   A    I mean, over the years, it's probably a couple of hours a

21   week.

22   Q    A couple hours a week?

23   A    Yeah.

24   Q    And does that vary?

25   A    It does, yes.
```

1  Q    Are there any days where you've spent two hours working on

2  POPS business?

3  A    Sure.  We've had meetings that are two hours.  So yes.

4  Q    But typically, it's two hours a week or less?

5  A    Yeah.  Two, three, four, maybe.  Sometimes it could be more,

6  depending.  But yeah.

7  Q    And how long have you had the current role with POPS?

8  A    I've been the finance chair for -- since July 1 and

9  treasurer for a year and a little bit more.  I've been on the

10  finance committee for many years.

11  Q    The finance chair of July 1 of this year?

12  A    Correct.

13  Q    Are you a member of the staff of the POPS?

14  A    No.

15  Q    You're a board member?

16  A    Correct.

17  Q    Volunteer board member?

18  A    Correct.

19  Q    But you have some understanding of the financial condition

20  of the POPS?

21  A    Yes.

22  Q    Does the POPS have financial statements?

23  A    Yes.

24  Q    When was the last time those were prepared?

25  A    We just had our audit recently, last couple of weeks.  And

1  it's not quite reported yet.  I don't believe it's finalized.

2  Q    So you don't yet have audited financial statements?

3  A    No, but I think they're expected very soon.

4  Q    Okay.  When was the last time you had --

5            THE COURT:  Hold on.  I'm sorry.  Ma'am?  I have an

6  active witness on my stand.  You are not to telegraph answers to

7  him at any point.

8            UNIDENTIFIED SPEAKER:  Understood.

9            THE COURT:  If I see it again, I'll ask you to leave my

10  courtroom.

11            UNIDENTIFIED SPEAKER:  Understood.

12            THE COURT:  Thank you.  Mr. Reed.

13            MR. REED:  Thank you, Your Honor.  That's not what I

14  expect in this court.  Thank you.

15  BY MR. REED:

16  Q    When was the last time you had audited financial statements?

17  A    Year ended July 1, 2022.  So they would have been reported,

18  you know, a year ago, nine months ago, something like that.

19  Q    Who's your outside -- this is an independent audit --

20  accounting firm?

21  A    It is.  Zalinski and Marty and his crew.  Forgive me, I

22  can't remember the name of it.

23  Q    Yeah.  Do you have a going concern opinion from your

24  accounting firm?

25  A    I believe so, yes.

1   Q    And what exactly is that?

2   A    It questions the viability of it as a going concern.

3   Q    And last year, the last time you received audited financial

4   statements, what was the conclusion?

5   A    I believe it was there.

6   Q    Do you know whether you'll receive that this time around?

7   A    I do not.

8   Q    Do you have cash on hand?

9   A    Not much.

10  Q    Do you have other non-cash assets?

11  A    Not much.

12  Q    Expand a little bit on that.  What are your non-cash assets?

13  A    Some intellectual property that, you know, I don't

14  know -- well, they're not cash.  Some -- some equipment,

15  instruments, that kind of thing.  You know, not much else.

16  Q    Do you record goodwill on your books?

17  A    We do not.

18  Q    You do not?

19  A    No.

20  Q    You're not a CPA, are you?

21  A    I am not.

22  Q    You have a finance degree from undergrad?

23  A    I do.

24  Q    When did you graduate?  1990?

25  A    Correct.

1  Q    Would you consider yourself to be a finance professional?

2  A    No.

3  Q    Have you ever charged for your time as a finance

4  professional?

5  A    I have not.

6  Q    Have you ever prepared anybody else's financial statements?

7  A    Friends and family taxes.

8  Q    We all have that burden.  Have you ever charged anybody to

9  prepare them?

10  A    No, never.

11  Q    Okay.  Forgive me, how long again -- how long have you been

12  associated with the POPS?

13  A    Twelve years or so.

14  Q    So you're aware that the POPS had a license agreement with

15  the Kimmel Center, correct?

16  A    Yes.

17  Q    And that was entered into in 2018, correct?

18          MR. DESTEFANO:  Objection.

19          THE COURT:  Basis?

20          MR. DESTEFANO:  Not relevant to irreparable harm.

21          MR. REED:  Your Honor, this is directly relevant.  So

22  when we talked about this from the outset, what they're asking

23  for is a mandatory injunction.  The fact that POPS has no

24  contractual right to use the facility is clearly relevant.

25  They're asking you to impose upon my clients a contract that has

1   expired.

2           THE COURT:  Thank you.  Overruled.

3   BY MR. REED:

4   Q    So we got to my next question.  Are you aware that that

5   agreement has expired?

6   A    I am.

7   Q    And it expired on June 30th of this year, correct?

8   A    Correct.

9   Q    Were you aware before June 30th that that agreement was

10  going to expire?

11  A    I don't recall.

12  Q    Was that discussed at the board meeting, any board meeting?

13  A    I don't recall.

14  Q    Do you recall any discussion with any staff member of the

15  POPS?

16  A    Not with regard to that specific -- you know, the -- the

17  expiration of it, no.

18  Q    But it's fair to say that to the extent the POPS wanted to

19  use Verizon Hall after the expiration of that agreement, you

20  would need to negotiate a new agreement, correct?

21  A    Sounds correct.

22  Q    You agree that the POPS should pay to use Verizon Hall,

23  right?

24  A    Yes.

25  Q    You should pay the rent, correct?

1   A      Yes.

2   Q      If you use services, you should pay for those services?

3   A      Yes.

4   Q      If you require lighting, for example, that you would pay for

5   the lighting?

6   A      Yes.

7   Q      For the sound equipment?

8   A      Yes.

9   Q      For the ushers?

10  A      Yes.

11  Q      The ticket takers?

12  A      Yes.

13  Q      Cleaning staff?

14          THE DEPUTY:  Your Honor?

15          THE COURT:  Yes?  I apologize.

16          I apologize, Mr. Reed.  My deputy was making me aware

17  that we're having an issue with lag with regards to our recording

18  system.  We want to make sure our record is tight.

19          MR. REED:  Of course.

20          THE COURT:  So we're going to take a brief recess until

21  our deputy lets us know that we're up and running correctly so

22  that we have a solid record.  I'm going to give us at least 15

23  minutes.  Everybody, counsel, take a comfort break.

24          MR. REED:  Thank you, Your Honor.

25          THE COURT:  Thank you.  My apologies.

1      (Recess taken from 12:06 p.m. to 12:30 p.m.)

2           THE COURT:  Please have a seat and speak up.  Mr. Reed,

3  the floor is yours.

4           MR. REED:  Thank you, Your Honor.

5  BY MR. REED:

6  Q    Mr. Meko, you understand you're still under oath, correct?

7  A    I do.

8  Q    Did you have any discussions with counsel during the break?

9  A    Nothing of significance, no.

10  Q    Did you talk about the substance of this case or your

11  testimony with your counsel during the break?

12  A    No.

13  Q    So before the break, we were talking about the obligation to

14  pay for rent and other services, correct?

15  A    Correct.

16  Q    I also had mentioned the 2018 license agreement.  If you

17  would, please, open your binder and turn to Tab 2.

18  A    Tab?  I'm sorry.

19  Q    2.

20  A    Okay.

21  Q    And I'll represent to you that that's the amended and

22  restated resident agreement -- license -- excuse me.  I'll start

23  over and go slower.  The Amended and Restated Resident Company

24  License Agreement, dated 14th of August 2018.  Do you see that?

25  A    I do.

```
 1   Q    Do you have any reason to believe this is not a true and
 2   correct copy of that agreement?
 3   A    I have no reason to believe it's not.
 4          MR. REED:  Your Honor, may I offer that into evidence,
 5   please?
 6          THE COURT:  Objections?
 7          MR. DESTEFANO:  Have you seen it before?
 8          THE COURT:  Do you have an objection?
 9          MR. DESTEFANO:  I mean, I think more foundation has to
10   be laid.
11          THE COURT:  Mr. DeStefano, I know, sir, that you've
12   been in courtrooms throughout your entire career.  You know the
13   proper form in which to object.
14          MR. DESTEFANO:  I object.
15          THE COURT:  Thank you.  Sustained.  Please lay a little
16   more foundation.
17   BY MR. REED:
18   Q    Have you seen this document before?
19   A    No.
20   Q    Are you aware that there is an agreement between POPS and
21   the Defendants in this case?
22   A    Yes.
23   Q    Turn if you will please to Schedule 2 of that document.
24          MR. DESTEFANO:  I object, Your Honor.
25          THE COURT:  Sustained.
```

1          MR. REED:  Your Honor, they're really going to object

2    to using this document?  It's a document that's in the record.

3    It's attached to our papers.  We can call Ms. Corbin and have her

4    verify it, authenticate it.  It seems like a waste of time.

5          THE COURT:  Again, Mr. Reed and Mr. DeStefano, I allow

6    you both to run your cases as you see fit.  As a former trial

7    lawyer myself, I used to prefer venues that allowed that to

8    happen.  So if Mr. DeStefano is choosing to object and I'm

9    sustaining it, then you're more than welcome to call Ms. Corbin

10   if need be.

11         MR. REED:  We will, Your Honor.  Thank you.

12   BY MR. REED:

13   Q    In any event, you understand that there was an agreement

14   between the POPS and the Kimmel Center to pay for rent and

15   services?

16   A    Yes.

17   Q    And you're aware that that agreement expired June 30th.

18   You've already testified to that effect, right?

19   A    Yes.

20   Q    And so you understood, then, that in order for the POPS to

21   continue to use the Kimmel Center in the future, you would need

22   to negotiate a new agreement?

23   A    As we had for many years.

24   Q    And you would expect to negotiate the amount of rent that

25   you would pay, correct?

```
1   A    Yes.

2   Q    And you would expect to negotiate the services for which you

3   would be required to pay, correct?

4   A    Yes.

5   Q    And that would be a negotiation, wouldn't it?

6   A    Yes.

7   Q    What would the POPS have done if you were unable to

8   negotiate acceptable terms from the POPS' perspective?

9            MR. DESTEFANO:  Objection.

10           THE COURT:  If he's aware.

11  A    I don't know.

12  BY MR. REED:

13  Q    So you're a member of the Board?

14  A    I am.

15  Q    You're the treasurer?

16  A    I am.

17  Q    You have no idea what your organization would do if it's

18  unable to negotiate acceptable terms for using this venue that

19  you say is essential to your business?

20  A    We -- we'd go out of business, I suppose.

21  Q    Or you might look for another facility, right?  Right?

22  A    No, I know of no facility we could look at.

23  Q    So you would just give up -- you wouldn't look to see if you

24  could play somewhere else?

25  A    We've done that.  We've looked around.
```

1    Q    You have, haven't you?

2    A    Yeah.

3    Q    Okay.  Let's turn to Tab 8 in your book, please.  Do you see

4    that?

5    A    Yep.

6    Q    That's a press release from the POPS, May 6th, 2019.  Have

7    you seen that before?

8    A    I have.

9    Q    Okay.  And you see the Philly POPS, the headline there says,

10   Philly POPS was named the principal orchestra of the Met

11   Philadelphia, correct?

12   A    Correct.

13   Q    You were, in fact, the principal orchestra of the Met

14   Philadelphia, correct?

15   A    Correct.

16   Q    Do you continue to be the principal orchestra of the Met

17   Philadelphia?

18   A    As far as I know.

19   Q    So you have the ability to perform at the Met Philadelphia,

20   correct?

21   A    Correct.

22   Q    Do you sell tickets for those performances?

23   A    I believe that, that -- they're typically sold -- often sold

24   through another party -- Ticketmaster, if I'm not mistaken.

25   Q    Right, and the POPS receives the receipts for those sales

1 less the service charge that --

2 A    Something like that.  I'm not familiar with the details.

3 Q    They're not free concerts, correct?

4 A    They are not.

5 Q    You hope to derive some revenue from those concerts,

6 correct?

7 A    Yes.

8 Q    You have, in the past, derived revenue from those concerts,

9 correct?

10 A    Yes.

11 Q    Turn, if you would please, to Tab 16 in your book.

12         MR. REED:  Actually, Your Honor, if I may, I'll offer

13 the document at Tab 8 into evidence.

14         MR. DESTEFANO:  Objection.

15         MR. REED:  Your Honor, it's their press release.  He

16 said he's seen it.  He authenticated it.

17         THE COURT:  Overruled.

18     (Defendant's Exhibit 8 admitted into evidence)

19 A    Will you repeat the question?

20 BY MR. REED:

21 Q    I just asked you to turn to Tab 16 in the book.  Do you have

22 that in front of you?

23 A    I do.

24 Q    Do you see that's a press release dated February 1, 2023; do

25 you see that?

1  A     Yep.

2  Q     Have you seen that document before?

3  A     Yes.

4  Q     Do you believe that's a true and correct copy of the press

5  release that the POPS issued on or about February 1st of this

6  year?

7  A     I have no reason to believe it's not.

8           MR. REED:  Your Honor, I'd offer that.

9           MR. DESTEFANO:  Again, I have a relevancy objection.

10           THE COURT:  Ms. (indiscernible), can I see the

11  (indiscernible)?

12           Mr. Reed?  Overruled.

13      (Defendant's Exhibit 16 admitted into evidence)

14  BY MR. REED:

15  Q     Mr. Meko, you see the title of this document of the press

16  release says, The Philly POPS Bringing "Get Up Stand Up: An

17  Encyclopedia of Soul" to the Met Philadelphia on February 18th;

18  do you see that?

19  A     I do.

20  Q     And the "Get Up Stand Up" concert was originally scheduled

21  to be performed in Verizon Hall, wasn't it?

22  A     Correct.

23  Q     And you -- following suspension by the Kimmel Center, you

24  proposed to hold that concert at the Met, correct?

25  A     Correct.

1  Q    And you proposed to honor tickets sold for the Verizon Hall

2  performance at the Met, correct?

3  A    Correct.

4  Q    As I understand it, your testimony was that that concert

5  didn't happen because you didn't sell more than say $5,000 worth

6  of additional tickets, right?

7  A    Correct.

8  Q    That's on top of the tickets that you had already sold and

9  were going to honor at the Met Philadelphia, correct?

10 A    We were going to try.

11 Q    That was your plan, correct?

12 A    Correct.

13 Q    You talked a little bit about the concert, the Christmas

14 concert.  The Christmas concerts last season were performed at

15 Verizon Hall, correct?

16 A    Correct.

17 Q    So when you talked about $1.1 million in ticket sales for

18 shows that had not yet been performed, you weren't referring to

19 the Christmas shows?

20 A    I was not.

21 Q    Thos had been performed?

22 A    Correct.

23 Q    So it's the 1.1 million for shows other than Christmas

24 shows?

25 A    Correct.

```
 1   Q    Shows that don't require a chorus, for example?

 2   A    I don't -- I don't know.  I don't know.  Some of them may.

 3   I do not know.

 4   Q    You don't know?

 5   A    I don't.

 6   Q    Do you know the seating capacity at the Met?

 7   A    Three thousand or something like that.

 8   Q    Do you know the seating capacity at Verizon Hall?

 9   A    Less.

10   Q    It's 2,500, thereabouts, right?

11   A    Sounds right.

12   Q    And that's about 3,200, correct?

13   A    Sounds right.

14   Q    Let's talk a little bit about the Met.  Where is the Met?

15   A    North Broad Street.

16   Q    How far north?

17   A    Above Girard.

18   Q    Recently renovated?

19   A    Yes.

20   Q    Long history?

21   A    Yes.

22   Q     A good space to entertain sponsors?

23   A    In some ways -- in some ways, no.

24   Q    They have bars there?

25   A    They do.
```

1  Q    Food?

2  A    Yeah.

3  Q    History?

4  A    Yeah.

5  Q    When you talk with sponsors about sponsoring the POPS, do

6  you extol those virtues about the Met?

7  A    We do, but they haven't been interested in the Met.

8  Q    So but when you speak with sponsors, you talk about the many

9  benefits of performing at the Met, correct?

10 A    To deaf ears, yes.  Yes.

11 Q    With respect, I'm asking you to answer my question, please.

12 You do talk about that, correct?

13 A    Yes.

14 Q    Let's turn, if you would please, to Tab 14 in your binder.

15 Do you see that?

16 A    I do.

17 Q    And that's a POPS press release dated January 4th of this

18 year, correct?

19 A    Correct.

20 Q    Have you seen this press release before?

21 A    I have.

22 Q    Is this a true and correct copy of that press release --

23 A    As far --

24 Q    -- to the best of your knowledge?

25 A    As far as I know.

1       MR. REED:  Your Honor, I'd offer it into evidence.

2       THE COURT:  Hearing no objection, so moved.

3       (Defendant's Exhibit 14 admitted into evidence)

4    BY MR. REED:

5    Q    Turn to the last page of that press release, if you would.

6    Do you see that?  Are you at that page I should ask you.

7    A    Yes.

8    Q    Okay.  Would you please read into the record the very last

9    sentence of that press release beginning, the Philly POPS?

10   A    "The Philly POPS performance is a founding resident company

11   of the Kimmel Cultural Campus and is the principal orchestra of

12   the Met Philadelphia and at venues throughout the Mid-Atlantic

13   region."

14   Q    Thank you.  So we've already talked about Verizon Hall,

15   correct?

16   A    Correct.

17   Q    We've talked about the fact that you're the principal -- or

18   the POPS is the principal orchestra at the Met, correct?

19   A    Correct.

20   Q    Has been since 2019, correct?

21   A    Correct.

22   Q    Has performed there, correct?

23   A    Correct.

24   Q    You also state that you perform at other venues throughout

25   the Mid-Atlantic region, correct?

1   A   Correct.

2   Q   This is a fair statement?

3   A   It is.

4   Q   It's an accurate statement?

5   A   It is.

6   Q   It remains true today?

7   A   It does.

8   Q   Could you name some of those venues, please?

9   A   Mann Music Center, North Penn High School.  Forgive me --

10  I'm blank.

11  Q   Have you played at the Irvine Auditorium at Penn?  When I

12  say you, I'm --

13  A   Yeah.

14  Q   -- referring to the POPS.  Forgive me.

15  A   I don't know.

16  Q   How about the Annenberg Center at Penn?

17  A   Yes, but not with the full orchestra.

18  Q   The McCarter Theater at Princeton?

19  A   Not -- not to my knowledge.  I don't know.

20  Q   How about Mullen Center out of Philadelphia?  You guys --

21  does the POPS perform there?

22  A   No.

23  Q   Are you capable of performing there?

24  A   Not with any financial success.

25  Q   Okay.  Are you familiar with the Roselle Center at

1  University of Delaware?

2  A    No.

3  Q    Have you looked to see if the POPS could perform there?

4  A    I have not, personally.

5  Q    Okay.  To your knowledge, has anybody at the POPS looked?

6  A    Not to my knowledge.

7  Q    To your knowledge, has anybody at the POPS looked to see if

8  you could perform at the Irvine Auditorium?

9  A    Not to my knowledge.

10  Q    To your knowledge, has anybody at the POPS looked to see if

11  you could perform at the Annenberg Center?

12  A    Not for the Philadelphia -- not for the orchestra.  It's

13  just -- it's not near big enough.

14  Q    How do you know?

15  A    It's a couple 100 seats at the --

16  Q    Okay.

17  A    -- Annenberg Center.

18  Q    Do you know the capacity of the McCarter Theater up at

19  Princeton?

20  A    I don't.

21  Q    Have you looked -- to your knowledge, has anybody --

22  A    Not --

23  Q    -- at POPS looked?

24  A    -- not to my knowledge.  I wouldn't be the one to be looking

25  in those to that degree.

1  Q    So there's others who would know better than you what --

2  A    Yes.

3  Q    -- whether the POPS could perform at a particular venue?

4  A    Yes.

5  Q    Are you familiar with the Dell in Philadelphia?

6  A    Sure.

7  Q    Have you looked into that as a potential venue for the POPS?

8  A    No.

9  Q    You mentioned the -- the POPS has performed at the Mann

10 Center, correct?

11 A    Correct.

12 Q    Famously, the POPS performs outside of Independence Hall,

13 correct?

14 A    Correct.

15 Q    Down in the Delaware River waterfront; do you perform there?

16 A    Not to my knowledge.

17 Q    Okay.

18 A    I don't know.

19 Q    Are you familiar with Longwood Gardens?

20 A    Yes.

21 Q    Has the POPS ever performed there?

22 A    Many years ago.

23 Q    And have you looked into the possibility of performing there

24 again?

25 A    I don't know.

1    Q    Who would know?

2    A    I'm sure Karen Corbin would know.

3    Q    Okay, anybody else?

4    A    No one that's currently on staff because there's no staff

5    left to know.

6    Q    So let's go back to Tab 14 if you would, please.  Go to the

7    first page of that January 4 press release.  Are you on that

8    page?

9    A    I am.

10   Q    So there's a sentence midway through the second paragraph.

11   I'll read it.  It says, quote, we must raise $2 million by the

12   end of our season in July to cover our obligations and secure our

13   future as a Philadelphia Institution, period, close quote.  Have

14   I read that correctly?

15   A    Yes.

16   Q    Do you see that reference to  obligations?

17   A    Yes.

18   Q    What are those obligations?

19   A    To our ticket holders, to other debts that we have, to the

20   orchestra.

21   Q    So those debts include debts to the Kimmel Center, correct?

22   A    Yes.

23   Q    They include debts to your musicians, correct?

24   A    Yes.

25   Q    They include debts to your ticket holders?

1  A    Yes.

2  Q    Have you raised $2 million by the end of the season?

3  A    No.

4  Q    Okay.  You agree that the POPS owes money to the Kimmel

5  Center -- we just disagree about the amount that's owed, correct?

6  A    Yes.

7  Q    So there were amounts that were required to be paid that

8  have not yet been paid, correct?

9  A    Yes.

10 Q    Turn to Tab 9 in your binder, please.  Do you see that

11 document?

12 A    I do.

13 Q    Have you ever seen that document before?

14 A    No.

15 Q    As a board member of the POPS, would you expect to see a

16 notice of default from the Kimmel Center?

17        MR. DESTEFANO:  Objection.

18        THE COURT:  Overruled.

19 A    I'm not sure.

20 BY MR. REED:

21 Q    Well, let me rephrase.  If the Kimmel Center, which is where

22 you've described it's essential for the POPS to perform, sends a

23 notice of default to the POPS saying that you've defaulted under

24 your agreement, would you expect, as a board member, to know

25 about it?

1  A    It's reasonable, yes.

2  Q    You would expect, right?

3  A    Yes.

4  Q    But yet you haven't seen this document?

5  A    No.

6  Q    Okay.  We'll turn to another one -- Tab 11.  It's a document

7  dated July 20 -- excuse me, July 1, 2020.  Have you seen that

8  document?

9  A    No.

10 Q    We can all read what it says.  It's a notice of default.

11 I'm not going to ask you to testify without the substance, but

12 would your testimony be the same on July 1, 2020?  If the POPS

13 received a notice of default from the Kimmel Center, would you,

14 as a board member and in your various capacities on behalf of the

15 POPS, expect to know about it?

16       MR. DESTEFANO:  Object because I don't see how this

17 goes to irreparable harm issue.  And again, I was under the

18 understanding that that's what was -- the scope of this hearing

19 was.

20       THE COURT:  Mr. Reed, I'm assuming you're going to link

21 this?

22       MR. REED:  Oh, I am, Your Honor, yes.

23       THE COURT:  Overruled.  I'll give you some leeway.

24       MR. REED:  Thank you, Your Honor.

25 /////

BY MR. REED:

Q    Let's turn to Tab 15, please.

        THE COURT:  Hold on.  I don't have any answer for my record.

        MR. REED:  Oh, I apologize.

        THE COURT:  It's okay.

        MR. REED:  So Your Honor, so --

        THE COURT:  No, not from you -- from the witness.  You asked a question -- there was an objection and there was no answer.

        MR. REED:  I'm sorry.  I was ready to testify.

        THE WITNESS:  I don't recall knowing about this.  I don't -- I'm sure I've never seen it.

BY MR. REED:

Q    And I think my question to you was would you expect to see a document like this.

A    Yes.

Q    Turn to Tab 15 in your binder, please.  Do you see that document?

A    I do.

Q    Okay.  And this is a letter -- I'll describe it to you. Frank Giordano.  Do you know who Frank Giordano is?

A    I do.

Q    And what was his role at the POPS on January 17, 2023?

A    His role had changed.  I believe he was still president if

```
 1   I'm not mistaken.

 2   Q    Have you seen this document before?

 3   A    No.

 4   Q    You were a board member at the time, correct?

 5   A    Yes.

 6   Q    On the finance committee?

 7   A    Yes.

 8   Q    And as a member of the finance committee, was one of the

 9   things that you were concerned about whether the POPS was paying

10   its bills?

11   A    Yes.

12   Q    But you didn't see a letter from the orchestra suspending

13   the POPS status --

14   A    No, I didn't see it --

15   Q    -- at the Kimmel Center?

16   A    -- but I was aware of it.

17   Q    Okay.  All right, so you were aware of it?

18   A    Yes.

19   Q    When did you first become aware of it?

20   A    I don't recall.

21   Q    Who told you about it?

22   A    I don't recall.

23            MR. DESTEFANO:  Your Honor --

24   BY MR. REED:

25   Q    What did they tell you about it?
```

1          MR. REED:  -- I have to object, Your Honor, because it,

2     again, we're not straying from relevance of this hearing.

3          THE COURT:   I'm --

4          MR. REED:  I'll move on, Your Honor.

5          THE COURT:  I need you to get there for me, Mr. Reed,

6     sustained.

7          MR. REED:  Thank you, Your Honor.  I'll move on.

8     BY MR. REED:

9     Q    Turn, if you will, to Tab 12.  Do you have that document in

10    front of you?

11    A    I do.

12    Q    Have you seen this document before?

13    A    I don't recall seeing it before.

14    Q    Are you aware that in March, in or about March 2021, the

15    POPS entered into an amendment to its license agreement to use

16    the Kimmel Center?

17    A    I don't recall.

18    Q    Did anybody tell you with form or substance that the Kimmel

19    Center had taken a position that time was of the essence for

20    compliance with the contractual obligations by POPS?

21    A    I -- I don't recall.

22    Q    Did anybody in form or substance tell you as a member of the

23    board of the POPS that if you defaulted on your agreement --

24    excuse me, the POPS defaulted on its agreement, that it would no

25    longer have the right to use the Kimmel Center?

1  A    I -- I don't recall.

2  Q    Did you believe in 2021 that the POPS had an obligation to

3  pay for the use of the Kimmel Center in advance of that use?

4  A    In advance of the use?  I -- I don't know.  I -- I don't

5  know.

6  Q    You don't know one way or the other --

7  A    Yeah, I don't know one way or the other.

8  Q    -- whether the POPS is required to pay for rent before it

9  used the facility?

10  A    Correct.

11  Q    Do you know whether the POPS actually did pay in advance for

12  the use of the facility for say the Christmas concerts last

13  season?

14  A    We did not.

15  Q    Do you know whether the POPS has paid anything towards the

16  use of Verizon's -- I'll withdraw the question.  It's a bad

17  question.

18      Has POPS paid for the rent for the time it used Verizon Hall

19  for last season's Christmas series?

20  A    Not to my knowledge.

21  Q    Has the POPS paid for the services that it was provided in

22  connection with those concerts?

23  A    Not to my knowledge.

24  Q    The ushers haven't been paid by the POPS?

25  A    No.

1  Q    Security hasn't been paid by the POPS?

2  A    No.

3  Q    The people who clean up after you were never paid?

4  A    No.

5  Q    Wardrobe?

6  A    No.

7  Q    Maybe most importantly, your musicians -- have they been

8  paid?

9  A    I believe they have.

10 Q    Your musicians have been paid for those concerts?

11 A    Yes.

12 Q    So the musicians have been paid all that they're owed?

13 A    For the Christmas concerts, I believe so -- I'm not certain.

14 Q    Okay.  You're not certain?

15 A    I'm not certain.

16 Q    Okay.   Turn if you would, please, to Tab 13 of your binder.

17 Do you have that document in front of you?

18 A    I do.

19 Q    Is this a document you've seen before?

20 A    No.

21 Q    There's a cover email and then there's an invoice attached.

22 If you turn to the second page of that document, have you seen

23 this invoice?

24 A    No.

25 Q    So it's your testimony, as treasurer of the POPS, that

1  you've not seen that invoice that was sent for your Christmas

2  concert series last year; is that right?

3  A    I believe that this is an attachment that was sent

4  yesterday, if I'm not mistaken, in regards to this.  And I'm not

5  certain that this is the same -- so I was not treasurer at the

6  time or the chair of the finance committee at the time.

7  Q    Okay.  So if you look at the upper right corner of the

8  second page of the document that's in your book at Tab 13, do you

9  see there's a date there, 12/30/22?

10 A    Yep.

11 Q    Is it your understanding that this document was created

12 yesterday?

13         MR. DESTEFANO:  Objection, Your Honor, objection.

14         THE WITNESS:  No, you asked me if had seen it --

15         THE COURT:  Hold on, hold on.  One second.

16         THE WITNESS:  Sorry.

17         THE COURT:  Overruled.

18 BY MR. REED:

19 Q    So I'm asking you a different question.  I'm not arguing

20 with you -- I'm asking you a different question.  Is it your

21 testimony that this was something created yesterday?

22 A    No.

23 Q    Okay, just wanted to be clear.  Thank you.  You are the

24 treasurer of the POPS now, correct?

25 A    I am.

1    Q    And you're on the finance committee --

2    A    I am.

3    Q    -- correct?  And you were in December of 2022?

4    A    Yes.

5    Q    And you are working with the POPS to figure out whether you

6    can remain solvent, correct?

7    A    Yes.

8    Q    And part of that process requires you to understand the

9    POPS' liabilities, correct?

10   A    Yes.

11   Q    The money that it owes, correct?

12   A    Yes.

13   Q    Including the money that it owes to the Kimmel Center,

14   correct?

15   A    Yes.

16   Q    Have you looked at the bills at the Kimmel Center sent that

17   haven't been paid?

18   A    I'm familiar with the amounts -- you asked me about the

19   specific document.

20   Q    I did.  I'm asking you now.  Have you looked at the document

21   -- the bills that the Kimmel Center paid that have -- excuse me,

22   sent -- that have not yet been paid?

23            MR. REED:  Objection as to relevance.

24            THE COURT:  Overruled.

25            THE WITNESS:  I've looked at some of them.  I can't say

1  I've looked at all of them.

2  BY MR. REED:

3  Q    And you don't know whether you looked at this one?

4  A    Correct.

5  Q    Do you know whether the rent charged by the Kimmel Center is

6  the rent that the parties agreed to in their license agreement?

7           MR. DESTEFANO:  Objection.

8           THE COURT:  Sustained.

9           MR. REED:  Your Honor, may I address it?

10           THE COURT:  Please.

11           MR. REED:  I'll tie it together.  I mean, so -- I mean,

12  for them, for the POPS to take the position that the injunction

13  is necessary for them to avoid irreparable harm, one of the

14  things they're going to have to convince you is that it's

15  sufficient to avoid irreparable harm.

16           Right now -- and again, they have a history of just

17  running up debt.  They perform one concert to pay for the last.

18  At some point, it's got to catch up with them.  So the fact that

19  there's millions of dollars, as we've heard admitted today,

20  millions of dollars in debt that they're hoping to satisfy by

21  incurring more debt at my client's expense, is directly relevant

22  to whether they can satisfy that element for their motion.

23           MR. DESTEFANO:  No, it's not, Your Honor.  It's success

24  on the merits, which is something -- a different element, and

25  it's not relevant to irreparable harm unless they're put back in.

1  I think we're going very far afield of what the scope of this

2  hearing was specifically nailed down as.

3          THE COURT:  Okay.  The objection's sustained.

4          MR. REED:  Okay.  I'll move on.

5  BY MR. REED:

6  Q    Let's talk about the musicians, right.  POPS can't perform a

7  concert unless it has people to play the music, correct?

8  A    Correct.

9  Q    You need your musicians to perform, correct?

10 A    Correct.

11 Q    Counsel for the POPS asked you about, I believe, money owed

12 to the musicians; do you recall that?

13 A    Correct.

14 Q     He may have also asked you about a lawsuit that was filed?

15 A    Correct.

16 Q    You're aware that a complaint was filed --

17 A    Yes.

18 Q    -- in federal court in this district, in this building?

19 A    I'm aware it was filed.

20 Q    And you realize that that was initiated by the filing of a

21 complaint; do you understand that?

22 A    I do.

23 Q    Have you seen a copy of that complaint?

24 A    I don't believe I --

25          MR. DESTEFANO:  Objection, Your Honor.  Again, it does

1  not go to the issue that was designated for this hearing.  And I

2  think the Court made it clear that she had enough, or it had

3  enough evidence that -- or at least enough to nail down a ruling

4  on that and only wanted to hear about irreparable harm.  Those

5  were the ground rules, Judge.  And I have to object to the extent

6  we're moving beyond those.

7      THE COURT:  Thank you, Mr. DeStefano.  Mr. Reed, do you

8  have a response?

9      MR. REED:  Yeah.  I don't mean to be flip, but hope is

10  not a plan.  If they can order us to reserve 25 dates on our

11  calendar and then if they show up and don't have musicians to

12  perform, then they have not avoided the irreparable harm.  The

13  injunction they're asking you to enter will not allow them to

14  avoid irreparable harm.  So their ability to get musicians to

15  perform for them is directly relevant to the question before Your

16  Honor.

17      THE COURT:  Thank you.  Overruled.

18  BY MR. REED:

19  Q    I think it was your testimony you don't know how much money

20  the POPS currently owes the musicians; is that correct?

21  A    I believe it's under -- I believe it's under dispute,

22  actually.

23  Q    Since there's a dispute, I'll respect it, but let me ask you

24  -- do you personally have an understanding of what that number

25  is?

1   A    Sixty thousand dollars, something like that.

2   Q    So you've calculated it?

3   A    No, I've been told.

4   Q    You've been told?

5   A    Yeah.

6   Q    That litigation's ongoing, correct?

7   A    As far as I know.

8   Q    Okay.  Turn if you would, please, to Tab 18 in your binder.

9   Are you with me?

10   A    Uh-huh.

11   Q    Have you seen this document before?

12   A    I have not seen the document, no.

13   Q    Okay.  Are you aware that the Musicians Union has placed the

14   POPS on its unfair list?

15   A    I am.

16   Q    Are you aware that the Musicians Union has instructed its

17   members that they may not perform for the POPS?

18             MR. DESTEFANO:  Objection.

19             THE COURT:  Basis?  Mr. DeStefano, what's your basis?

20             MR. DESTEFANO:  Again, relevance.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.

23   BY MR. REED:

24   Q    The POPS remains on that unfair list?

25   A    As far as I'm aware.

1  Q    Nobody's told you that the musicians can play for the POPS?

2  A    Nobody has told me that.

3  Q    Do you have an understanding of if that issue will ever be

4  resolved?

5  A    I don't.

6  Q    Do you have any idea of when it might be resolved?

7  A    I believe that if we can get back in play, it'll be

8  resolved.

9  Q    That's your belief?

10  A    Yes.

11  Q    Has anybody told you that to be the case?

12  A    No.

13  Q    Have the musicians told you that if you get this order from

14  the court that they will come back and perform for the POPS?

15  A    No.

16  Q    Has the union told you that if you get this order that they

17  will remove the POPS from the unfair list?

18  A    No.

19  Q    But you haven't seen this document that's Tab 18, have you?

20  A    No.

21  Q    Okay.  You said that the POPS received about $1.1 million in

22  ticket money for concerts that have not yet been performed,

23  correct?

24  A    Correct.

25  Q    Where is that money?

```
1    A    Spent on other things.

2    Q    Who spent it?

3    A    Philly POPS.

4    Q    The POPS received that money?

5    A    Yes.

6    Q    And it spent it?

7    A    Yes.

8    Q    Didn't put it into escrow?

9    A    No.

10   Q    If the court were to enter an order requiring the Kimmel

11   Center to permit the POPS to perform again on Verizon Hall, would

12   the POPS expect to pay its outstanding obligations before that

13   happened?

14   A    To the -- outstanding obligations to?

15   Q    Well, I'll go through them each but remember, we looked at a

16   document that referred to -- that you needed to raise $2 million

17   to --

18   A    Uh-huh.

19   Q    -- pay for your outstanding obligations.

20   A    Right.

21   Q    Do you recall that document?

22   A    Yes.

23   Q    So that's what I'm referring to now.  I'll get more detail,

24   but the obligations that you referred to in your press release.

25   Do you expect to take care of those obligations before you take
```

1   the Verizon Hall stage again?

2   A    I assume so.

3   Q    How? What money are you going to use?

4   A    We are actively pursuing significant funding right now so

5   that we can do that.

6   Q    Do you have any firm commitments for that money?

7   A    We do not.

8   Q    So you don't know whether you'll be able to satisfy those

9   commitments or not?

10  A    I do not know.

11  Q    Do you expect the musicians to perform for the POPS without

12  being paid?

13  A    No.

14  Q    And if you were to take the Verizon Hall stage again, would

15  you expect to pay the Kimmel Center rent?

16  A    Yes.

17  Q    With what money?

18  A    With the money we're going to raise from ticket sales.

19  Q    Let's talk about ticket sales.  So you have a 1.1 million

20  outstanding, right?

21  A    Uh-huh.

22  Q    Would you --

23          THE COURT:  I'm sorry -- is that a yes?

24          THE WITNESS:  Yes.

25          THE COURT:  Thank you.  I apologize.

```
 1              THE WITNESS:  No.

 2              THE COURT:  We need that for the record.

 3  BY MR. REED:

 4  Q    Would you honor those tickets first?

 5  A    Yes.

 6  Q    Have you done any kind of analysis to determine how much

 7  incremental --

 8  A    Yes.

 9  Q    -- ticket revenue you could generate?

10  A    Yes.

11  Q    And how much is that?

12  A    I -- I don't have that number in front of me.

13  Q    Do you have an estimate?

14  A    No.

15  Q    You don't know?

16  A    Not as I sit here now.

17  Q    We talked about the performance at the Met.  You sold $5,000

18  in tickets, right?

19  A    Yeah.

20  Q    Was that a surprise to you?

21  A    Yes.

22  Q    You were projecting more revenue than that, right?

23  A    Yes.

24  Q    By the way, has the inability to perform affected your

25  relationship with your patrons?
```

```
 1    A     Yes.

 2    Q     They want their money back, don't they -- many?

 3    A     Some.

 4    Q     Have you done any assessment of the likelihood that people

 5    will buy new tickets for performance by the POPS, given the

 6    history?

 7    A     Assessment?

 8    Q     Yeah.  Do you know whether people will feel comfortable

 9    giving you their money with the risk that you will spend it and

10    not perform?

11    A     We don't -- I'm not aware of any study.

12    Q     It's reasonable to think that might impact your ticket

13    sales, right?

14    A     Yes.

15    Q     Did you factor that into your calculation -- the one you

16    don't remember today?

17    A     I'm sure we did.

18    Q     You're the treasurer -- the finance committee, yes?

19    A     Yes.

20    Q     Did you see some --

21    A     We have --

22    Q     -- that type of analysis?

23    A     -- we have projections and analysis on that, yes.

24    Q     Okay.  And again, so if you're going to use -- withdrawn.

25    Do you have a plan -- I'll withdraw that, too, sorry.
```

1      We talked a little bit about bankruptcy, right?  Have you

2  made the decision to file for -- has the POPS made the decision

3  to file for bankruptcy?

4  A    We've talked about it.  We haven't made a decision.

5  Q    Okay.  Do you know what type of bankruptcy it would be?

6  Would it be dissolution or reorganization?

7  A    We would hope reorganization?

8  Q    But you haven't decided yet?

9  A    Correct.

10  Q    Have you had any discussions with the POPS' creditors about

11  the potential for bankruptcy?

12  A    No.

13  Q    The filing is not imminent, I assume?

14  A    No.

15  Q    How long have you been talking about bankruptcy at the POPS

16  Board?

17  A    Months.

18  Q    When was that?

19  A    Maybe in the spring.

20  Q    Can you be more specific?

21  A    No.

22          THE COURT:  And just so I'm clear, we're talking about

23  spring of 2023?

24          MR. REED:  Yes, yes.

25          THE COURT:  Thank you.

BY MR. REED:

Q    So did you personally, as treasurer of the POPS Board,

recognize that bankruptcy might be necessary following suspension

from the Kimmel Center?

A    Yes.

Q    That was in January?

A    Yes.

Q    Did you personally consider the possibility that bankruptcy

might be necessary when the POPS was put on the unfair list by

its union and its musicians were forbidden from playing for the

POPS?

A    Did I personally think about that --

Q    Yes.

A    -- at that time?  Yes.

Q    Any discussions at the Board level?

A    No.  I mean, not specific to that issue.

Q    You're aware that my clients filed counterclaims in this

lawsuit?

A    Yes.

Q    Are you aware that -- have you -- have you seen that

document?

A    I have not.

Q    Are you aware that the POPS filed an answer to those

counterclaims?

         MR. DESTEFANO:  Objection.

1        MR. REED:  Your Honor, very limited.

2        MR. DESTEFANO:  Again --

3        MR. REED:  I --

4        MR. DESTEFANO:  -- it's way beyond the scope of --

5        MR. EED:  -- I'm not going to ask substance.

6        THE COURT:  Gentlemen?

7        Mr. DeStefano?

8        MR. DESTEFANO:  Way beyond the scope of what this

9   hearing is supposed to be for.

10       THE COURT:  Thank you, sir.  We are using a recording.

11  So if you're both speaking at the same time, neither of you have

12  anything preserved on this record.

13       Mr. Reed?

14       MR. REED:  Yeah, that was my fault.  I apologize, Your

15  Honor.  It's very -- if he's seen it, I want him to get

16  authenticated.  I'm not going to get into the substance.

17       THE COURT:  Well, in that case, sustained.

18       MR. REED:  Okay.  May I ask if he's seen it?

19       THE COURT:  You may ask if he's seen it.

20  BY MR. REED:

21  Q    Have you seen the answer that the POPS filed -- the answer

22  to the counterclaims asserted against the POPS in this

23  litigation?

24  A    Yes.

25       MR. REED:  To follow up, process only?

1          MR. DESTEFANO:  No.

2          Your Honor --

3          MR. REED:  Your Honor, I'm asking you, not Mr.

4  DeStefano, excuse me.

5          THE COURT:  Thank you.  I assume you have an objection,

6  though, Mr. DeStefano?

7          MR. DESTEFANO:  Yes.

8          THE COURT:  Sustained.

9          MR. REED:  All right.  One second -- I might be done.

10          THE COURT:  Yes.

11          MR. REED:  No further question at this time.  Thank

12  you.

13          THE COURT:  Thank you.  Any redirect?

14                         REDIRECT EXAMINATION

15  BY MR. DESTEFANO:

16  Q    Is it true, sir, that you're waiting for the outcome of this

17  motion to pull the trigger on a bankruptcy or decide to pull the

18  trigger on a voluntary bankruptcy?

19          MR. REED:  Objection.  Leading.

20          THE COURT:  Sustained.

21  BY MR. DESTEFANO:

22  Q    Well, let me ask you this.  What are you waiting for before

23  making a decision or final decision on bankruptcy?

24  A    Whether we can get back in the Kimmel Center or not.

25  Q    And you're aware that you may not have a decision because

1  one of your creditors or more would be able to put you into

2  bankruptcy?

3         MR. REED:  Objection, Your Honor.  Leading.

4         THE COURT:  Sustained.

5         MR. DESTEFANO:  Okay.

6  BY MR. DESTEFANO:

7  Q    Are you aware that there's such a thing as involuntary

8  bankruptcy engendered or --

9  A    Yes, yes.

10  Q    -- provoked by --

11  A    Yes.

12  Q    Let me go back to the licensing agreement that expired in

13  June of this year.  Was that the first licensing agreement that

14  expired between the parties going back to 2021?

15  A    Going back to 2021?

16  Q    Yes.  I'm sorry -- 2001 when you first started playing at

17  the Verizon Hall.

18  A    There have been many different licensing agreements over the

19  years.

20  Q    And have they always been renewed?

21  A    Yes.

22  Q    Up until this latest one that happened in June after you had

23  been evicted?

24  A    Yes.

25  Q    Okay.  So it was a course of conduct between the Kimmel

1    Center and --

2              THE COURT:  Sustained.

3              MR. DESTEFANO:  Okay.

4    BY MR. DESTEFANO:

5    Q    What was the typical length, to the best of your knowledge,

6    of the licensing agreements, the prior licensing agreement?

7    A    I -- I don't know.  I -- I'm going to guess several years,

8    to the best of my knowledge.

9    Q    Okay.  But up until the latest one, they had always been

10   renewed --

11   A    To my knowledge.

12   Q    -- by the parties?

13   A    Yes.

14   Q    All right.  Now, I think your testimony on cross-examination

15   was that the POPS aspired and even scheduled a concert at the

16   Met.  Was that one or more concerts at the Met?

17   A    Well, the February concert, the subscription concert, was

18   one.

19   Q    Okay, all right.  And that couldn't come to pass?

20   A    It did not.

21   Q    And would you state the reasons that couldn't come to pass?

22   A    Our subscribers, our patrons, were not going to go there,

23   and they told us that through emails and phone calls, for the

24   fact that we couldn't sell any more tickets.  Our own subscribers

25   were not going to go there, even though they already had a

1    ticket.  They were not going to show up, and we knew that, based

2    on their reaction.

3    Q    Was there an availability of the preferred -- the dates you

4    had historically played -- Friday, Saturday, Sunday?

5    A    Typically, the best date for us traditionally has been

6    Sunday and that is not available on Sunday.  So not all the dates

7    are available.

8    Q    Now, I think Mr. Reed has mentioned that you had actually

9    performed at the Met, POPS had actually performed at the Met in

10   years gone by?

11   A    Uh-huh.

12   Q    All right.

13            THE COURT:  Sorry -- is that a yes, sir?

14            THE WITNESS:  Yes, sorry.

15   BY MR. DESTEFANO:

16   Q    Were those one-off concerts?

17            MR. REED:  Objection, Your Honor.  One-off

18   concerts -- he's testifying.

19            MR. DESTEFANO:  Or a series.

20            THE COURT:  The witness has actually used the term one-

21   off multiple times.

22            MR. DESTEFANO:  Right.

23            THE COURT:  Overruled.

24   BY MR. DESTEFANO:

25   Q    Were those one-off concerts?

1   A    Yes.  Yeah, so we'd play one concert, not a subscription

2   concert, often in conjunction with some other organization.

3   Q    When you say often in conjunction with some --

4   A    Like Disney.

5   Q    -- other organization --

6   A    Like Disney or some other organization that would present.

7   We would perform, but it's their production.

8   Q    Okay.  So you backed up another person's --

9   A    Essentially, yes.

10   Q    -- production in a one-off conference --

11   A    Often times.

12   Q    -- at the Met?

13   A    Yes.

14   Q    Okay, all right.  Are you able to perform a series --

15   A    No.

16   Q    -- or a Christmas concerts at the Met?

17   A    Not with any success, no.

18   Q    Now, Mr. Reed mentioned a whole bunch of other places, and I

19   took notes.  So are these other places mentioned by Mr. Reed

20   times when the POPS have performed what has been referred to as a

21   one-off conference?

22   A    Yes.  In the cases of those that we did perform at, yes.

23   Q    Okay.  And in the Mann, did they have anywhere near the

24   seating capacity of Verizon Hall?

25   A    The ones that I'm aware of that Mr. Reed listed do not, and

1    many of them are not even close.  If we could find another place,

2    we would consider it.  I'm not aware of one.

3    Q    Were some of these free concerts?

4    A    Many of them, yes.

5    Q    Many of the other venues were free concerts --

6    A    Yes.

7    Q    -- they weren't ticketed?

8    A    Correct.

9    Q    And as far as the Mann and the Dell, those were outdoor --

10   were those outdoor summer concerts?

11   A    We've never, to my knowledge, performed at the Dell.  We

12   have performed at the Mann outdoor free summer concerts.

13   Q    Okay.  Now, the concert season recognized by both the

14   orchestra and the POPS is when?  When's it start -- when does it

15   end?

16   A    September through May --

17   Q    Okay.

18   A    -- typically.

19   Q    That's primary not good weather days?

20   A    Generally.

21   Q    The series of both orchestras all take place within that

22   span of time indoors?

23   A    Correct.

24   Q    Can you perform outdoors during that concert season?  Or is

25   it feasible to perform outdoors --

1    A    I mean --

2    Q    -- at places like the Mann or whatever?

3    A    I guess in September and May it is -- certainly not in

4    December and January.

5    Q    Or November?

6    A    Right.

7    Q    March, April?

8    A    Correct.

9    Q    And to the extent, the concert at the Delaware River or

10   concert at Independence Hall, were those free concerts?

11   A    Free concerts, yes.

12   Q    So these outdoor concerts that were performed in good

13   weather days, 4th of July or whatever, were free concerts?

14   A    Non-ticketed, free concerts.

15   Q    Okay.  Can the POPS survive as an orchestra by only

16   performing free concerts or outdoor concerts, or concerts at

17   venues with a couple hundred seats or maybe even a thousand

18   seats?

19   A    No.

20   Q    And do you get corporate sponsorships for those free

21   concerts?

22   A    Some of them we do.

23   Q    But for the ticketed concerts --

24   A    Yes.  For the ticketed concerts, we do.

25   Q    So the Annenberg Center -- would that be suitable --

1   A    No.

2   Q    -- for a concert series that's performed during the concert

3   --

4   A    No.

5   Q    -- season?

6   A    No, too small.

7   Q    I can't read my own writing.  Villanova University?

8   A    Too small, a couple hundred seats.

9   Q    Princeton -- that Princeton venue -- was it Princeton

10  University?

11  A    Yeah, I'm not familiar with the venue.  I don't know if we'd

12  do a subscriber series at Princeton.  It doesn't make sense to

13  me.

14  Q    Why doesn't it make sense to you?

15  A    We're the Philly POPS.  To my knowledge, we've never done a

16  subscription series outside of Philadelphia.

17  Q    And your sponsors are all -- are your sponsors all

18  Philadelphia centric organizations?

19  A    Uh-huh.  Yes.

20  Q    Or in the main (phonetic)?

21  A    Yes, yeah.

22  Q    The musicians -- is it your belief or plan to pay whatever

23  you owe the musicians -- and I understand it's in dispute out of

24  proceeds from the concerts that you play if you're allowed back

25  in Verizon Hall.

1   A    Along with contributions and sponsorships, yes.

2   Q    Okay.  And do you believe you'll be able to substantially

3   repay all of the POPS' debts, legitimate debts, that are not in

4   dispute if you're allowed back into Verizon Hall for the upcoming

5   2003-04 concert season?

6           MR. REED:  Objection, Your Honor.

7           THE COURT:  Sustained.

8   BY MR. DESTEFANO:

9   Q    What's the POPS' plan?  Does the plan include the payment of

10  most or all of your undisputed debts?

11  A    Most, yes.  I mean, clearly, we'd have to go through some

12  negotiation with some.

13  Q    Okay.  And would that include the Kimmel Center?

14  A    Yes.

15  Q    As the treasurer and member of the finance committee of the

16  POPS, do you feel that it is feasible if you're allowed back into

17  Verizon Center for the concert season, to substantially pay all

18  of the monies owed as well as a redemption of the tickets that

19  had been sold?

20          MR. DESTEFANO:  Objection, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. DESTEFANO:

23  Q    Is there a plan -- I think you mentioned there was a

24  feasibility study of some sort, but to your knowledge, is there a

25  plan to repay all or substantially all of your acknowledged debt

1    if you're put back into the Verizon Hall?

2    A    There's a plan to pay most of them back, yes.

3    Q    Okay.  And those would be paid for how?

4    A    Contributions and ticket sales.

5    Q    That would -- you'd have an opportunity for if you're

6    allowed to play concerts?

7              MR. REED:  Your Honor, objection.

8              MR. DESTEFANO:  Okay.

9              THE COURT:  Sustained --

10             MR. DESTEFANO:  I'll withdraw.

11             THE COURT:  -- Mr. DeStefano.

12             MR. DESTEFANO:  Okay.

13   BY MR. DESTEFANO:

14   Q    Now, historically, prior to this past season, were you

15   always allowed or consented to have payment plans that

16   contemplated the payment of Kimmel obligations out of proceeds of

17   upcoming concerts?

18             MR. REED:  Objection, Your Honor.  This is beyond the

19   scope of my cross.

20             MR. DESTEFANO:  Oh, no, it's not.  His cross was

21   designed to say, you're not going to be able to or you're not

22   going to -- you allowed the evidence to come in over my

23   objection, so I have to address it.

24             THE COURT:  Overruled.

25   BY MR. DESTEFANO:

1    Q    Do you remember the question?

2    A    Yeah.  To my knowledge, we had all kinds of different plans

3    and all through the years, yes.

4         THE COURT:  Sustained at this point.  I'm striking the

5    answer based on the response from the witness.

6    BY MR. DESTEFANO:

7    Q    Up until this Christmas concert of last season, did the POPS

8    always manage, over time -- not necessarily in advance -- but at

9    or shortly after the performance of a subsequent conference, to

10   pay its obligations to Kimmel?

11        MR. REED:  Your Honor, again, he's testifying.  This is

12   leading.

13        MR. DESTEFANO:  I don't think it's leading.

14        THE COURT:  Mr. DeStefano?

15        MR. DESTEFANO:  I don't think it's leading.

16        THE COURT:  Understood -- I do.

17        MR. DESTEFANO:  Okay.

18        THE COURT:  Sustained.

19        MR. DESTEFANO:  All right, all right.

20   BY MR. DESTEFANO:

21   Q    What, up until this last debt, had been the practice or the

22   course of conduct between the Kimmel Center and POPS as to the

23   payment of obligations to the Kimmel Center?

24   A    The course of conduct?

25   Q    Yes.

1   A    We would pay and sometimes it was late.  As to my knowledge,

2   we paid, and we paid what we owed.

3   Q    Did the Kimmel Center typically advance payment plans over

4   time for the payment of concerts -- previous concerts?

5          MR. REED:  Your Honor, same objection, beyond the

6   scope.

7          THE COURT:  Sustained as to that question.

8   BY MR. DESTEFANO:

9   Q    These notices of default that you were shown, is it your

10  understanding -- what is your understanding as to whether or not

11  any notices of default, prior to the last, were cured?

12         MR. REED:  Objection.

13         THE COURT:  Sustained.

14  BY MR. DESTEFANO:

15  Q    The defaults were cured.

16         MR. REED:  Objection.

17         THE COURT:  Sustained.

18  BY MR. DESTEFANO:

19  Q    Do you know whether or not the defaults were cured?

20         MR. REED:  Objection.

21         THE COURT:  Sustained.

22  BY MR. DESTEFANO:

23  Q    Did you or other people from the POPS continue to try to

24  negotiate with the Kimmel Center regarding the payment --

25  whatever was outstanding for the Christmas concerts, after you

1   were evicted?

2           MR. REED:  Objection, Your Honor.  Beyond the scope.

3           MR. DESTEFANO:  Beyond the scope?

4           THE COURT:  Mr. DeStefano?

5           MR. DESTEFANO:  I don't think it's beyond --

6           THE COURT:  I don't appreciate --

7           MR. DESTEFANO:  -- the scope of the cross-examination.

8           THE COURT:  Sir?

9           MR. DESTEFANO:  Yes.

10          THE COURT:  I'm showing you the respect to say that I

11  am not enjoying your running commentary.

12          MR. DESTEFANO:  Okay.  So the objection was sustained?

13  Okay.  That's all I have on redirect, Your Honor.

14          THE COURT:  Thank you very much.

15          MR. REED:  Very, very brief.

16          THE COURT:  And within the confines, please.

17                      RECROSS-EXAMINATION

18  BY MR. REED:

19  Q    You testified that the POPS always paid what it owed?

20  A    To my knowledge, yes.

21  Q    Have you paid what you owe to the Kimmel Center?

22  A    The question was, I believe, had we paid what we owed prior

23  to that?

24  Q    Pardon me.  So my question to you now is have you paid what

25  you owe.

```
 1   A    No.

 2              MR. REED:  Thank you, Your Honor.

 3              THE COURT:  Thank you.

 4                    FURTHER REDIRECT EXAMINATION

 5   BY MR. DESTEFANO:

 6   Q    And what was the only reason why you didn't pay what you

 7   believed you owed?

 8              MR. REED:  Objection.

 9              THE COURT:  Overruled.

10   A    We couldn't -- couldn't perform.  We had no income.

11   Q    Thank you.

12              THE COURT:  And just so we're clear -- could not

13   perform specifically --

14              THE WITNESS:  At the Kimmel Center.

15              THE COURT:  Thank you.  Thank you. Anything else, Mr.

16   Reed?

17              MR. REED:  No, Your Honor.

18              THE COURT:  Thank you very much. Mr. Meko, thank you

19   very much.  You may step down.

20              We are currently at 1:30, everyone.  And given the fact

21   that this is running a little longer than I think we had

22   anticipated, I'm inclined to give everyone a break.  I believe

23   that was your only witness; is that correct?

24              MR. DESTEFANO:  Yes.

25              THE COURT:  Anything on your end, Mr. Reed, just so I
```

1   can get a sense of timeline.

2         MR. REED:  Well, Your Honor, I think we need to call

3   Ms. Corbin, since the witness couldn't identify many of the

4   documents.

5         THE COURT:  Okay.  Here's what we're going to do.

6   We're going to take a lunch recess then, and I'm going to allow

7   everyone to regroup.  I'll see everyone back here in an hour --

8   2:30.

9         MR. REED:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         THE BAILIFF:  All rise.

12     (Recess taken from 1:28 p.m. to 2:46 p.m.)

13         THE COURT:  Okay.  Mr. Reed?

14         MR. REED:  I'd like to call Ms. Corbin, please.

15         THE COURT:  Please.

16         THE CLERK:  Please remain standing and raise your right

17   hand.

18        <u>KAREN CORBIN, DEFENDANT'S WITNESS, SWORN</u>

19         THE CLERK:  Thank you.  Please state your full name for

20   the record.

21         THE WITNESS:  Karen Corbin.

22         THE CLERK:  Thank you.

23         THE COURT:  Thank you.  Good afternoon, Ms. Corbin.

24         Mr. Reed your witness.

25              <u>DIRECT EXAMINATION</u>

1  BY MR. REED:

2  Q    Good afternoon, Ms. Corbin.

3  A    How are you?

4  Q    I'm well.  Thank you.  How are you?

5  A    Good.  Thanks.

6  Q    By whom are you employed?

7  A    Encore Series, Inc. dba The Philly POPS.

8  Q    And I'll refer to them as the POPS today.  Is that okay?

9  A    Yes.

10 Q    What is your role at the POPS currently?

11 A    Currently the president and CEO.

12 Q    And when did you become the president and CEO?

13 A    In March?

14 Q    And before that, were you affiliated with the POPS?

15 A    I was the chief operating officer.

16 Q    And I should have asked.  When you said March, March of this

17 year?

18 A    Yes.

19 Q    And before that, I'm sorry, what role did you serve?

20 A    Chief operating officer?

21 Q    And how long did you hold that role?

22 A    September of 2019.

23 Q    Okay.  Continuously from September of 2019 until you became

24 the CEO?

25 A    Yes.

1   Q    And were you affiliated --

2           THE COURT:  I'm sorry.  I'm going to ask everybody to

3   keep their voice up a little louder for me.

4           THE WITNESS:  Oh, okay.  Sorry.

5           THE COURT:  Just because it is being recorded.  Thank

6   you, Ms. Corbin.

7   BY MR. REED:

8   Q    And before that, the role you took in 2019, were you

9   affiliated with the POPS?

10  A    Yes.

11  Q    And what role did you have then?

12  A    Vice President.

13  Q    In total, how many years have you been -- have you worked

14  for the POPS?

15  A    Nine.

16          MR. REED:  Your Honor, permission to treat the witness

17  as hostile for this purpose.

18          THE COURT:  Let's see if we get there, Mr. Reed.  I

19          MR. REED:  Well, all I do -- want to do is lead, Your

20  Honor.  She's the CEO of the Plaintiff in this case.

21          THE COURT:  I understand.

22          MR. REED:  Yeah.

23          THE COURT:  We'll get there if we need to get there.

24          MR. REED:  Okay.  Fair enough.

25  BY MR. REED:

1    Q    Ms. Corbin, there's a binder in front of you.  If I could

2    ask you, please, to turn to the document at Tab 2.

3             MR. DESTEFANO:  I'm sorry.  What was that Tab Number,

4    2?

5             THE WITNESS:  Two.

6    BY MR. REED:

7    Q    Do you recognize that document?

8    A    Yes.

9    Q    Have you seen it before?

10   A    I have.

11   Q    What is it?

12   A    It's the amended and restated resident company license

13   agreement dated August 14th, 2018.

14            MR. REED:  Your Honor, I'd offer that into evidence,

15   please.

16            THE COURT:  So moved --

17            MR. DESTEFANO:  I have only a relevancy objection.

18            THE COURT:  Thank you.  Overruled.

19        (Defendant's Exhibit 2 admitted into evidence)

20   BY MR. REED:

21   Q    Ms. Corbin, would you turn to page 5 of the document at Tab

22   2 in your binder?  Do you see that --

23   A    I do.

24   Q    -- page?

25   A    Uh-huh.

1   Q    And in paragraph 5, there's a reference to the term,

2   T-E-R-M.  Do you see that?

3   A    I do.

4   Q    And you see that the term of this agreement extends through

5   June 30, 2023, correct?

6   A    Yes.

7   Q    To your knowledge, has that term been extended by the

8   parties?

9   A    It has not.

10  Q    Turn, if you would, to the -- near the back of the -- of

11  that document at Tab 2.  There's a document that is titled,

12  Schedule 2.  Do you see that schedule?

13  A    I do.

14  Q    Can you describe what that is, please?

15  A    It's a schedule of rental and service rates.

16  Q    And these were rent and service rates that were agreed to by

17  the parties in connection with this 2018 agreement?

18  A    I was not in the capacity of that agreement at that time,

19  but I believe so.

20  Q    You understand them to be the rates at -- to which the

21  parties agreed.  Is that correct?

22  A    Yes.  Uh-huh.

23  Q    Thank you.  And you see in the left hand column under the

24  heading, KCI spaces, there's a reference to Verizon Hall?

25  A    I do.

1  Q   And you see the first column to the right reads 18,654-

2  slash-P?

3  A   I do.

4  Q   Did you see that?  And then there's a figure to the -- in

5  the column to the right of that, 10,550-slash-P.  Do you see

6  that?

7  A   Yes.

8  Q   And is it your understanding that that was the rent to be

9  paid for the use of Verizon Hall by POPS in -- for the 2018/2019

10  season?

11  A   I really hadn't looked at those particular years.  There's

12  an odd $8,000 dip between the two and I wasn't, as I say, in

13  charge of that area at that time, but that's what the document

14  seems to say.  In other words, it's $8,000 cheaper in 18/19, than

15  it was in 17/18.

16  Q   Understood.  And then the column to the right says plus 3

17  percent for 19 -- the '19-'20 season, correct?

18  A   It does.

19  Q   And then plus 3 percent the following year.  Correct?

20  A   Yeah.  Again, I'm unclear as to whether the plus 3 percent

21  is on the 10-5-50.  It's just confusing the way it's laid out.

22  Q   Okay.  Okay.  The last column in that row reads '22-'23.

23  Do you understand that to be the 2022-2023 season?

24  A   I do.

25  Q   And so the parties negotiated rates for rent through 2023 in

1  connection with this agreement, correct?

2  A    They did.

3  Q    Similarly, there's negotiated rates for services as listed

4  in the bottom half of Schedule 2 of this agreement, correct?

5  A    Yes.

6  Q    And again, those rates were negotiated through the term, the

7  entire term of this agreement through June 30 2023, correct?

8  A    Well, actually, at the bottom, it indicates that they were

9  not negotiated at that time.  It calls for a rack rental rate,

10 which implies to me that they were not negotiated then but would

11 have been negotiated in the subsequent years.

12 Q    Fair point and thank you for that clarification.

13 A    Uh-huh.

14 Q    So for some services, like security, for example, there's a

15 negotiated rate and an agreed to 3 percent increase each year,

16 correct?

17 A    Some.  Significant number of ones that were left open.

18 Q    Understood.  Thank you.  Okay.  Let's turn then please

19 to -- we're going to move through this -- the document at Tab 5

20 of your binder.  Do you have that document in front of you?

21 A    The deferred payment schedule for amended and restated

22 resident company license agreement?

23 Q    That's the re: line on this letter, yes.

24 A    Yes.  Yes.

25 Q    Have you seen this document before?

1    A    I have not.

2    Q    We'll move right along then.  So, let's go to the document

3    at Tab 6.  Do you have that in front of you?

4    A    I do.

5    Q    Can you describe to the Court what that is?

6    A    It's an amendment to amended and restated resident company

7    license agreement dated the second day of May 2019.

8    Q    And is that a document that you've seen before?

9    A    It is not.

10   Q    Are you aware that the parties entered into an amended

11   license agreement on about May 2nd, 2019?

12   A    If I could just look.  I brought some notes so that I could

13   be sure.  2nd 2019 -- I discovered that there was such a

14   document, but did not see the exact document last week when I did

15   an analysis.  I had not seen it prior.

16   Q    Okay.  And what you -- the notes that you just looked at,

17   that helps you to refresh your memory?

18   A    Yes.  I -- a lot of the pre-COVID documents were kept in

19   hard copy form, and so it was a bit of a search to make sure that

20   I put the right history together to be competent to testify

21   today.

22   Q    Okay.  And then -- so those -- that research refreshed your

23   memory?

24   A    Yes.

25   Q    Okay.

1  A     Uh-huh.

2          MR. REED:  Your Honor, I'd ask for a copy of those

3  materials, please.

4          THE COURT:  Granted.

5          MR. REED:  Okay.

6  BY MR. REED:

7  Q    Okay.  Were there an -- other than the document you just

8  handed me, which I guess for the record, your honor will mark

9  Defense Exhibit 1, were there any other documents that you

10 referred to or created that refreshed your recollection to

11 that -- for your testimony today?

12 A     Regarding the Kimmel license agreement?

13 Q    With regard to the subject matter of your testimony in this

14 case.

15 A     So routinely, I gather information, in order to properly

16 analyze next steps for my position, but specifically for

17 testimony today, it really was limited to the examination of the

18 contents of the Kimmel contract, because it seemed called for in

19 some of the documents you had put forward earlier.

20 Q    Okay.  And was one of the documents that you reviewed this

21 May 2, 2019 amendment?

22 A     I did not review it.  I did not have the opportunity to

23 review it and believed that it was superseded by further

24 documents on the list I just gave you.

25 Q    Okay.  So you're aware that the amendment occurred.  You

1   just didn't read it.  Is that your testimony?

2   A    I did not analyze it or look at it.  That is correct.

3   Q    Then to the best of your knowledge, you've never seen this

4   agreement?

5   A    That's correct.

6   Q    What other documents do you have with you in your binder?

7           MR. DESTEFANO:  Objection.

8           THE COURT:  What's your basis, Mr. DeStefano?

9           MR. DESTEFANO:  Unless she uses it to refresh his

10  (sic), recollection, there's no entitlement to it and it doesn't

11  get marked as an exhibit.

12          THE COURT:  She hasn't referred to anything additional

13  at this point, Mr. Reed, so do you have an argument for me as to

14  why you're entitled to it at this point?

15          MR. REED:  Well, I think she -- she's never, frankly,

16  seen this before, but so she brought notes to aid her in her

17  testimony today, brought them up at the witness stand and has

18  referred to them.  She pulled one page out of it, but I don't

19  know what else is in there.

20          THE COURT:  That was the page that she had referred to

21  was all testifying.  So at this point, I'm going to sustain the

22  objection.  If she is referring -- does go back to refer to

23  anything, it does need to be turned over to you.

24          MR. REED:  Thank you, Your Honor.

25  BY MR. REED:

1  Q   Okay.  So you're aware, through your review, that there was

2  an amendment in May 2019, correct?

3  A   Yes.

4  Q   Are you aware that as part of that amendment, the parties

5  negotiated a revised schedule for rent and fees?

6  A   I was not, no.

7  Q   Okay.

8  A   And I -- let's see.  I see it here.  I had not seen this

9  particular document previously.

10 Q   Okay.

11 A   It was prior to my promotion to chief operating officer.

12 Q   We'll skip it.  Thank you.

13 A   Uh-huh.

14 Q   So turn, if you would please, to the document a Tab 9.

15         THE COURT:  I'm sorry, counsel.  9, did you say?

16         MR. REED:  9.

17         THE COURT:  Thank you.

18 BY MR. REED:

19 Q   Do you see that document?

20 A   I do.

21 Q   And what is that?

22 A   It's an email, an overnight delivery of an amended and

23 restated resident company license agreement dated August --

24 it's an amendment to the agreement dated August 14th, 2018, but

25 it's dated June 2nd, 2020.

1  Q    Okay.  So is -- you're referring to the re: line on this

2  letter, correct?

3  A    Yes.

4  Q    Have you seen this document before?

5  A    No.

6  Q    Okay.  So are you aware -- and tell me now.  This is June

7  2nd, 2020.  What was your role at the POPS at that time?

8  A    I was the chief operating officer.  It was during the

9  pandemic and the early months of the pandemic.

10  Q    But you were the chief operating officer --

11  A    Yes.

12  Q    -- of the POPS?

13  A    Yes.

14  Q    As the chief operating officer of the POPS, would you expect

15  to receive a copy of a notice of default from the Kimmel Center?

16  A    At that time, not necessarily.

17  Q    And you have no recollection of being told, informed that

18  the POPS had received a notice of default from the Kimmel Center

19  on or around --

20  A    No, not in those words.

21  Q    Well, how about your words.  Were you aware that the POPS

22  was in default of its contractual obligations to the Kimmel

23  Center in June of 2020?

24  A    I was.

25  Q    How did you become aware?

1  A    So before we had closed the office for the pandemic, which

2  was the week of March 10th, 2020 our credit card processing

3  agent, TSYS, had ceased contributing, you know, the flow of cash

4  that would be written into the ticketing system and were holding

5  onto any revenue being written through tickets or donations.  And

6  they began that policy on March 10th.  So at that point, it took

7  perhaps two weeks to track down what the issue was.

8        And you'll recall that if not on March 10th, but certainly

9  on March 15th, all of the offices closed down in Philadelphia, I

10 believe by mandate, although I'm not sure of the date of that.

11 So obviously, without revenue, it became clear to me that we were

12 going to have difficulty meeting our obligations, so I was aware

13 of that general strategy and this particular item, I believe was

14 handled by our then treasurer and chair of the finance committee

15 at that time.

16 Q    So you're aware that POPS was in default for failure to pay

17 money owed to the Kimmel Center, correct?

18 A    I was aware of the general climate.  I did not see that we

19 were notified of default, no.

20 Q    And again, my question is not about this letter, just your

21 knowledge about whether the POPS was in default at the time.  And

22 I believe your testimony, but -- was that you were aware.

23 A    I understand that we had not met our obligations.  I think

24 there was particular language for default that I don't have in

25 front of me at this moment.

1  Q    Okay.  When you say you hadn't met your obligations --

2  A    Uh-huh.

3  Q    -- what obligations are you talking about?

4  A    Obligations to accounts payable, obligations to staff.

5  Q    Okay.  And when you say accounts payable, what -- are you

6  saying that you failed to pay what you owed?

7  A    That is correct.

8  Q    Okay.  Do you know how much you were in debt to the Kimmel

9  Center at that point?

10 A    I certainly could research that.  I, again, was not prepared

11 to testify in that level of detail today, but it certainly is

12 information I could discover.

13 Q    If you were told that the Kimmel Center was telling the POPS

14 that at the time, it had failed to pay nearly $550,000 in past

15 due amounts, would that surprise you?

16 A    I'm just looking at the date range to make sure I

17 understand.  I do know that number, because we did develop a

18 payment plan for it and we cured the default.  I do know that

19 number, yes.

20       MR. REED:  Your Honor, I move to strike the answer as

21 nonresponsive.

22       MR. DESTEFANO:  I think it was responsive.

23       THE COURT:  Well, I think we're looking for a number

24 specifically with regards to 550,000.  Sustained.  Stricken.

25       MR. REED:  Okay.

1   /////

2   BY MR. REED:

3   Q    Let's move to the document that's at Tab 11 of your binder.

4   Let me know, please, when you're there.

5   A    Uh-huh.

6   Q    Can you describe, please, what that document is?

7   A    It's an email overnight delivery notice of default.

8   Q    Have you seen this document before?

9   A    I have not.  Again, the office was closed at this time and I

10  was not copied on this.

11  Q    And again, what was your title at -- as of July 1st, 2020?

12  A    Chief operating Officer.

13  Q    And as chief operating officer, your testimony is you did

14  not receive a notice of default from the Kimmel Center?

15  A    That is my testimony.

16  Q    Were you made aware on or about July 1, 2020 that the POPS

17  had received a notice of default?

18  A    I was not.

19  Q    Had you been told that the Kimmel Center was asserting that

20  the POPS owed $548,000 at the time?

21  A    Again, I recognize that number specifically, but I cannot

22  state today when that number came to my attention when the office

23  was closed during the pandemic.

24  Q    Who was the CEO of the -- POPS at the time?

25  A    We did not have a CEO.

1   Q   Who was the president?  Did you have a President?

2   A   Frank Giordano, who was the recipient of these documents,

3   was a board member, also titled president at that time.  He was

4   not a member of staff.

5   Q   And were you in communication with Mr. Giordano during the

6   pandemic?

7   A   Yes.

8   Q   Regularly?

9   A   Yes.

10   Q   Turn, if you would, to the document at Tab 12.  Can you

11   identify that, please?

12   A   This is an amendment to the resident company license

13   agreement dated August 14th, 2018 that deals with the cure for

14   the $548,000 amount due.

15   Q   And have you seen this document before?

16   A   I was given it after the fact, yes.

17   Q   Okay.  So you recognize this document?

18   A   I do.

19   Q   Do you have any reason to believe this is not a true and

20   correct copy of that amendment?

21   A   It is.

22        MR. REED:  Your Honor, I'd offer it in evidence,

23   please?

24        THE COURT:  So moved.

25        MR. DESTEFANO:  Again, relevancy.

1          THE COURT:  Overruled.

2          (Defendant's Exhibit 12 admitted into evidence)

3   BY MR. REED:

4   Q    Ms. Corbin, if you would, turn the second page of that

5   document at Tab 12 and there's a section 3-B.  Do you see that?

6   A    I do.

7   Q    Begins, "Time is of the essence."  Do you see that?

8   A    I do?

9   Q    Did you understand at the time that the Kimmel Center's

10  position was that time was of the essence for POPS to pay what it

11  owed under the license agreement?

12  A    Certainly.

13  Q    On the next page at the very top, you see a section E?

14  A    I do.

15  Q    Okay.  And would you read the first sentence of that

16  section, please?

17  A    "Licensee shall pay to KCI 100 percent of the fees or

18  estimates thereof for each use of the premises no later than 30

19  days in advance of such use."

20  Q    Thank you.  Was it your understanding that that was Pop's

21  obligation to KCI under the agreement?

22  A    Under the terms of this amendment, which I believed was

23  retired in September of this year, yes.  I did understand that.

24  Q    Okay.  Turn to the document at Tab 13, please.  And you see

25  there's an email that is addressed to you, Karen Corbin.  You see

1  that?

2  A    Yes, I do.

3  Q    Is that -- do you recognize this email addressed to you,

4  dated December 30, 2022?

5  A    I do.

6  Q    And there's an attachment to that email, correct?

7  A    Uh-huh.

8  Q    It's also at Tab 13, right?

9  A    Uh-huh.

10            THE COURT:  Is that a yes?

11            THE WITNESS:  Yes.  Sorry.

12  BY MR. REED:

13  Q    And that's an invoice, correct?  It has invoice at the top?

14  A    The attachment does, yes.

15  Q    And it's address to Encore Series, Inc.,

16  Corbin-comma-Karen.  That's you, right?

17  A    It is.

18  Q    And it's dated, if you look at the upper right, December 30,

19  2022, correct?

20  A    It is.

21  Q    And do you recognize this invoice?

22  A    Of course.

23            MR. REED:  Your Honor, I'd offer both the email and the

24  invoice into the evidence.

25            MR. DESTEFANO:  Objection.

1          THE COURT:  Thank you.  Overruled.

2          (Defendant's Exhibit 13 admitted into evidence)

3     BY MR. REED:

4     Q    Have you reviewed this invoice that's at Tab 13 of your

5     binder?

6     A    I turned it over to Matt Kovial (phonetic), also copied on

7     this invoice, who was at that point, head of production for his

8     review, since he is the person who would have used the facility

9     on a daily basis and asked for him to return it to me upon his

10    getting through that document.

11    Q    Ms. Corbin, thank you, but I'd ask you to answer my

12    question.  My question is, did you review this invoice?

13    A    I did not review it in that way.  No, I would not have had

14    the information to.  I looked at it.  If you're asking me if I

15    looked at the total, I did.

16    Q    Did you review the entries on this invoice?

17    A    I did not.

18    Q    Do you have any reason to believe that the charges reflected

19    on this invoice are inaccurate?

20    A    Yes.

21    Q    What is that?

22    A    We've had ongoing billing problems with the Kimmel over

23    time, so they were always handled by a careful review and a line

24    by line analysis and there often were anomalies.  So that's the

25    process we entered into with this invoice as a standard operating

1  procedure.

2  Q    And you'll see if you look at 13 that the amount for

3  rent -- I'll give you an example.  There's a number of them.  If

4  you look at page 1 of 5 on the invoice.  So it's the second page

5  of the document at Tab 12 -- excuse me, Tab 13 behind your email.

6  I'm going to confuse you.  It's the first page of the invoice.

7  A    First page of the invoice.  Okay.

8  Q    And you see near the bottom, there's a line, Verizon Hall

9  slash PERF.  You see that?

10 A    I don't.

11 Q    There's a number.  Maybe this will help you.  So again,

12 you're on page 1 of 5 of the invoice, correct?

13 A    I am.

14 Q    Okay.  So 1, 2, 3, 4 lines from the bottom, the line is the

15 number --

16 A    Oh, yes.

17 Q    Do you see it?

18 A    I see it.  Thank you.

19 Q    Of course. Of course.

20 A    Uh-huh.

21 Q    And if you follow it from Verizon Hall performance, you see

22 charges $11,874, correct?

23 A    I do.

24 Q    And that's the amount of rent that was being charged,

25 correct?

1  A    Yes.

2  Q    Do you believe that that amount is accurate?

3  A    I have no reason to believe the rents would differ from the

4  expected charge, no.

5  Q    Right.  In fact, that that is the number that the parties

6  had agreed.  That is the cost to rent the facility that the

7  parties had agreed to years earlier, correct?

8  A    Again, that's that 3 percent lift and I would have to go

9  back and research this to get to the right amount, but it seems

10  to be accurate.  That would be the last place I would look for an

11  anomaly.

12  Q    Well, let's go -- yeah.  So let's go to Tab 6, please, the

13  last page of Tab 6.  You see that?

14  A    I do.

15  Q    And there's a Schedule 2 and if you look at the top line

16  Verizon Hall slash performance far right under 22-23, $11,874,

17  right?

18  A    Right.  The document that I had testified I had not seen,

19  yes.

20  Q    Do you have any reason to believe that that isn't the rent

21  that POPS agreed to pay?

22  A    No.

23  Q    Okay.  Let's keep going, so we can get you out of here.  So

24  Tab 15, please.  Do you have that in front of you?

25  A    I do.

1  Q    That's a document dated January 17th, 2023, correct?

2  A    It is.

3  Q    At that point, you're still the COO of the POPS, correct?

4  A    I am.

5  Q    Have you seen this document?

6  A    I'm just going to look at that same document that you

7  already have.  I believe I have seen it.

8  Q    And this is the letter that POPS received, notifying it that

9  it was being suspended from operation --

10 A    Yes.

11 Q    -- at the Kimmel Center?

12 A    I said I believe -- now that I've read it, I have seen it.

13 Okay?

14 Q    And this is an true and correct copy of that letter, to the

15 best of your knowledge?

16 A    To the best of my knowledge, yes.

17        MR. REED:  Your Honor, I'd offer that into evidence,

18 please.

19        THE COURT:  So moved.

20     (Defendant's Exhibit 15 admitted into evidence)

21 BY MR. REED:

22 Q    You see the second paragraph of that letter begins with the

23 sentence, "Unfortunately."  Do you see that?

24 A    I do.

25 Q    And actually I'm going to ask you to skip down to the last

1   sentence in that paragraph, beginning, "The last payment."  Do

2   you see that?

3   A    I do.

4   Q    Could you read that last sentence, please?

5   A    "The last payment POKC has received from licensee was

6   $160,000 on September 16th, 2022."

7   Q    Do you have any reason to dispute that that -- in fact, that

8   that sentence is accurate?

9   A    That sentence is accurate.

10  Q    So in fact, the last payment that the POPS has made to POKC

11  was back in September of 2022?

12  A    Yes.

13  Q    In the amount of 160,000?

14  A    Yes.

15  Q    And that was before the Christmas concerts performed --

16  A    Yes.

17  Q    -- in 2022?  No payment has been made by the POPS since?

18  A    That's correct.

19  Q    Turn if you would, please, to the document at Tab 18 of your

20  binder.  Do you see that?

21  A    I do.

22  Q    Do you recognize that document?

23  A    I do.

24  Q    You've seen this before?

25  A    Uh-huh.

1  Q    Can you describe it for the record, please?

2  A    It's an official notice that the Philly POPS has been added

3  to the American Federation of Musicians on unfair list.

4        MR. REED:  I'd move this into the record, please.

5        THE COURT:  So moved.

6     (Defendant's Exhibit 18 admitted into evidence)

7  BY MR. REED:

8  Q    In addition to notifying the POPS that it had been placed on

9  the unfair list, the notice reads in part, quote, "AFM members

10 shall not render musical services for organizations,

11 establishments or people who have been placed on the

12 international unfair list," correct?

13 A    Yes.

14 Q    In short, the musicians in the union are not permitted to

15 play for the POPS, right?

16 A    At this moment.

17 Q    That remained -- it was true when you received this notice

18 in around March 9th of this year, correct?

19 A    Yes.

20 Q    And it remains true today?

21 A    Yes.

22 Q    In fact, the union has sued the POPS, correct?

23 A    Yes.

24 Q    Would you turn to the document at Tab 19.  Do you see that?

25 A    Yes.

1  Q    Do you recognize this to be the complaint that the union

2  filed in federal court against the POPS?

3  A    I do.

4           MR. REED:  Your Honor, I'd move this into the record.

5           MR. DESTEFANO:  Objection.

6           THE COURT:  Basis?

7           MR. DESTEFANO:  Again, relevance to the specific issued

8  identified for resolution or evidence today.

9           THE COURT:  The musicians would -- or availability of

10  the musicians themselves would go to the irreparable harm issue,

11  unless I'm missing something here.  I don't believe I am.  Okay.

12  Overruled.

13      (Defendant's Exhibit 19 admitted into evidence)

14  BY MR. REED:

15  Q    Turn, if you would, to page 6 of that document at Tab 19 of

16  your binder.  Do you see that?

17  A    I do.

18  Q    You see Paragraph 37, at the top of that page?

19  A    I do.

20  Q    And you see that the union is asserting that the POPS owes

21  not less than $313,472.55 --

22  A    Yes.

23  Q    -- correct?

24  A    That is their assertion.

25  Q    Is this litigation ongoing?

1  A    It is.

2  Q    Turn to page -- Tab 20, please, the document at Tab 20.  And

3  do you recognize that to be the POPS' answer to --

4  A    I do.

5  Q    -- the complaint?

6          MR. REED:  Your Honor, I'd offer that into evidence.

7          THE COURT:  So moved.

8      (Defendant's Exhibit 20 admitted into evidence)

9  BY MR. REED:

10 Q    Turn, if you would, to page 7 of that document.  At the top,

11 you'll see the number 15.  Do you see that, paragraph 15?

12 A    Yes.

13 Q    And there's an answer to paragraph 15, correct?

14 A    Yes.

15 Q    And the last sentence of that answer states, quote, "The

16 POPS recently received the grant for the December 10th, 2022

17 event and will apply such grant once amounts due and owing are

18 agreed upon with Plaintiffs," correct?

19 A    Yes.

20 Q    Has that grant been paid to the musicians yet?

21 A    I think it reads once the amount is due and agreed upon with

22 Plaintiff, so it has not been.  We have not made an agreement.

23 Q    And so you've made no payment --

24 A    That's correct.

25 Q    -- to the musicians?

1          THE COURT:  If -- I just have a clarification.  Did you

2    receive that grant money?  Did the POPS receive the grant money?

3          THE WITNESS:  We did.  It was a much larger grant for a

4    longer period of time.  It wasn't specific to this use, but we

5    did receive the money six months later than expected.

6          THE COURT:  Okay.  Thank you.

7    BY MR. REED:

8    Q    Where's that money now?

9    A    The money was applied to other musician payments that

10   occurred in July and December, other than this and to other

11   expenses that were related to the production of the Salute Series

12   in the Calendar Year 2022.

13   Q    So the money's been spent?

14   A    Yes.

15         THE COURT:  How much was that grant?  I apologize.  How

16   much was that grant?

17         THE WITNESS:  The grant was $300,000.

18         THE COURT:  Thank you.

19   BY MR. REED:

20   Q    How much of that 300,000 remains?

21   A    The grant has been used to cover expenses that existed from

22   December and May, so it is not still available for this use.  The

23   grant did not specify this specific use.

24   Q    So you don't have any of the 300,000 left?

25   A    Very little.

1  Q    Oh, very little?

2  A    Uh-huh.

3  Q    How much?

4  A    I -- you know, I don't know.  I'm happy to go back and do

5  that again.  I did not expect any of this detail to be asked

6  today.

7  Q    Turn, if you would, please, to the document at Tab 21.  Are

8  you there?

9  A    Yes.

10 Q    And you recognize that document to be the answer and

11 affirmative defenses of Defendants and counterclaims that my

12 clients filed in this lawsuit?

13 A    I do.  Uh-huh.

14 Q    You've seen this before?

15 A    I have.

16 Q    Turn, if you would, please, to --

17         MR. DESTEFANO:  I'm going to object to that.  Again,

18 answers and counterclaims not being relevant, again, to this

19 specific issue that we have for discussion here today.

20         MR. REED:  Your Honor, I'm not entering, or offering,

21 rather, our pleading into the -- into evidence.  Sorry.  I'm not

22 being very articulate.  It's already before you.  I'll cite it

23 later.  I'm not asking you to, to accept it into evidence.

24         THE COURT:  Understood and I do see the relevance here,

25 based on our inquiries today.  Thank you.  Overruled.

1   BY MR. REED:

2   Q    Ms. Corbin, turn to the document at Tab 23.

3   A    23?  Yes.

4   Q    And do you recognize that to be the Pop's answer and

5   affirmative defenses to the Defendant's counterclaims in this

6   case?

7   A    I do.

8   Q    Did you review this document before it was filed?

9   A    Yes.

10  Q    Did you authorize your attorneys to file it?

11  A    Yes.

12  Q    Paragraph one of this frankly bizarre answer lists a number

13  of paragraphs --

14          MR. DESTEFANO:  I'm going to object.

15          THE COURT:  Sustained, Mr. Reed.

16          MR. REED:  I apologize, Your Honor.  That wasn't called

17  for it, although I do want to note for the record my  serious

18  concerns about this answer.  It doesn't comply with the rules and

19  we --

20          THE COURT:  And --

21          MR. DESTEFANO:  -- and we want to address it later.

22          THE COURT:  Understood.  Thank you.

23          MR. REED:  But there was no call for the comment.  I

24  apologize.  Withdrawn.

25  BY MR. REED:

1  Q    Paragraph 1 lists a number of paragraphs that are admitted

2  by the POPS, correct?

3  A    It does.

4  Q    Among those paragraphs is paragraph number 169, correct?

5  A    Yes.

6  Q    Okay.  And just for the sake of completion, turn back the

7  tab -- the document at Tab 21 and turn, if you would, please, to

8  paragraph 169 of the counterclaims.  You'll find that at page 45

9  of the document.  Do you have that?

10  A    Yes, I do.

11  Q    Would you read for the Court what's alleged in paragraph 169

12  --

13  A    "As of," --

14  Q    -- which the POPS has admitted?

15  A    "As of June 20th, 2023, the POPS owes KCI 561,000 in

16  outstanding rent and fees, inclusive of interest in late

17  penalties."

18        MR. REED:  And Your Honor, I'll just represent for the

19  record that, that there are further allegations in paragraphs,

20  170, 171 and 172 that are not answered at all in their answer,

21  not denied, and so should be deemed admitted, but you won't find

22  them in the POPS' answer.

23        THE COURT:  Thank you.

24  BY MR. REED:

25  Q    Ms. Corbin turn, if you would, please, the document at Tab

1  24 of your binder.  Do you have that in front of you?

2  A     Yes, I do.

3  Q     And you recognize that to be an excerpt from the POPS'

4  website?

5  A     Yes.

6  Q     And I'll represent that that was -- this was printed, and so

7  last visited on July 21st of this year.

8         MR. REED:  And Your Honor, I'll offer this into

9  evidence.

10        THE COURT:  So moved.

11     (Defendant's Exhibit 24 admitted into evidence)

12  BY MR. REED:

13  Q     If you turn to the third page of the document at Tab 24 at

14  the top of that page, you'll see the first line reads, "I'll be

15  home for Christmas."  Do you see that?

16  A     Yes, I do.

17  Q     The last sense of that paragraph begins, "The Philly POPS,"

18  correct?

19  A     Yes.

20  Q     Would you read that sentence into the record, please?

21  A     "The Philly POPS performs as the principal orchestra of the

22  Met Philadelphia and at venues through the Mid-Atlantic region."

23  Q     Throughout the Mid-Atlantic region?  Is that what it says?

24  A     Over time, yes.

25  Q     I'm sorry.  Did I miss the misread it?  What does it say

1  gain?

2  A    Sir, it says at venues throughout the mid-Atlantic region.

3  I didn't want you to be confused to think that that was ongoing

4  today.

5         THE COURT:  Okay.  Again --

6         THE WITNESS:  Okay.  So I've read it.

7         THE COURT:  -- Mr. Reed's question is very

8  specific --

9         THE WITNESS:  Okay.

10         THE COURT:  -- and he asked you to read it.

11         THE WITNESS:  Okay.  I did.

12         MR. REED:  So Your Honor, I'd move to strike the last

13  answer.  Let me ask the question again, if I may.

14         THE WITNESS:  "The Philly POPS" --

15         THE COURT:  Hold on.

16         THE WITNESS:  Oh, sorry.

17         THE COURT:  It's stricken.  You may re-ask the

18  question, please.

19  BY MR. REED:

20  Q    Would you please read verbatim the last sentence of that

21  paragraph?

22  A    Of course.

23  Q    Thank you.

24  A    "The Philly POPS performs as the principal orchestra of the

25  Philadelphia and at venues throughout the Mid-Atlantic region."

1 Q     Thank you.  And there's a photograph on that page?  Do you

2 see that below?

3 A     Yes.

4 Q     Where's that picture taken?

5 A     At the Met.

6 Q     Thank you.  I have no more questions.

7          THE COURT:  Mr. DeStefano.

8                    CROSS-EXAMINATION

9 BY MR. DESTEFANO:

10 Q     Despite the document that was shown to you regarding the do

11 not work for list of the union and Philly POPS being on that

12 list, are you familiar with or participate in the negotiations

13 between the union and the POPS over this litigation dispute?

14          MR. REED:  Objection, Your Honor.  It's beyond the

15 scope.

16          MR. DESTEFANO:  No.

17          THE COURT:  Overruled.

18 BY MR. DESTEFANO:

19 Q     Are you familiar with the negotiations between --

20 A     Yes.

21 Q     -- the POPS and --

22 A     Yes, I am.

23 Q     -- notwithstanding that letter?

24 A     Yes.

25 Q     Okay.  Having participated in those negotiations, is it your

1  belief that you will be able to get the union back to work on

2  while this litigation is ongoing, but to work on any concerts

3  that you have -- are able to schedule in Verizon Hall for the

4  upcoming season?

5          THE COURT:  I'm going to interrupt and ask you to

6  rephrase, because I'm clear --

7          MR. DESTEFANO:  Okay.

8          THE COURT:  -- as to the question, please.

9          MR. DESTEFANO:  All right.

10 BY MR. DESTEFANO:

11 Q    Having participated in those negotiations with the union

12 that are ongoing, is it your belief that you will be able to get

13 the musicians, the union musicians, back to work on any concerts

14 that you may be able to perform in Verizon Hall during the

15 upcoming season?

16 A    Yes.

17 Q    Okay.  Please explain what leads you to believe that.

18 A    Sorry?

19 Q    Please explain.

20 A    The digital payment that became overdue in March was not for

21 a performance.  It was for a digital distribution and there were

22 disputes about the amount of that, as there often are in the

23 digital realm.  So we believe that we can achieve a settlement on

24 that and that is the direction that our attorney assigned to that

25 project has to achieve a settlement as soon as possible.

1  Q    And if you are allowed back into the Horizon Hall, how would

2  you pay that?

3  A    The conditional nature of our fundraising has already been

4  explained.  I believe that we have folks waiting for the results

5  of this hearing in order to fund the ongoing efforts of the POPS

6  both at the Kimmel and for the outdoor concerts that occur

7  seasonally.  And of course, we would begin to sell tickets.

8  Q    The $561,000 amount that the POPS admitted it owes for the

9  Christmas concert, what's the reason why that has not been paid

10 as of yet?

11 A    So, as we saw, the invoice arrived, I believe December 30th

12 and obviously the office was closed for the holidays.  As we

13 said, about reviewing the invoice, the eviction occurred and we

14 were not able to sell tickets, which would have allowed us to

15 continue payments to the Kimmel.  Further, we were negotiating

16 terms to complete the season throughout the time frame from

17 September through December.  And therefore, were awaiting the

18 total and the result of those negotiations, which that

19 arrangement never came to fruition.

20 Q    Had you not been evicted by the POPS, would you have derived

21 sufficient revenues, whether it be contributed or ticket sales to

22 pay that obligation?

23         THE COURT:  I apologize.  I'm going to interrupt before

24 I even entertain your objection, Mr. Reed.  I want to make sure

25 I'm understanding Ms. Corbin's testimony.

1    MR. DESTEFANO:  Okay.

2    THE COURT:  Ms. Corbin, you're saying that you were in

3  the middle of renegotiating with the Kimmel Center at the time?

4    THE WITNESS:  Yes.

5    THE COURT:  So your -- it's your position that the

6  eviction basically ended those negotiations and the eviction also

7  made it so that you were not able to continue selling tickets to

8  pay for your past debts?

9    THE WITNESS:  It did pause the negotiations.  We tried

10  again down the line to enter into a payment plan negotiation

11  again, but we did present a payment plan on January 3rd to a

12  representative of the Kimmel that would have retired this

13  obligation.

14    THE COURT:  I guess -- I want to make sure I'm

15  understanding.  At the same time that you are in default for the

16  nonpayment of -- to the tune of over $500,000, you're attempting

17  to renegotiate terms with the Kimmel Center?

18    THE WITNESS:  No, the timing's off.  The payment plan

19  was delivered prior to the notice of default.

20    THE COURT:  Okay.  But your lack of payment had already

21  occurred, correct?  You were already behind.

22    THE WITNESS:  I don't believe so.  I think that we

23  routinely had paid the Kimmel for Christmas over the next five

24  months for years and had had payment plans for years and we had

25  every expectation that another payment plan would be accepted.

1    So our intent was to pay as we had in previous years.

2              THE COURT:  So you're relying on the goodwill of the

3    Kimmel Center to continue that arrangement.  That was the

4    business model?

5              THE WITNESS:  That was the business model.

6              MR. DESTEFANO:  That's all I have.

7              THE COURT:  Anything additional.

8              MR. REED:  No, Your Honor.  Thank you.

9              THE COURT:  Thank you, Ms. Corbin.

10             Any additional witnesses?

11             MR. JOHNS:  Your Honor, we call Mario Mestichelli,

12   please.

13             THE COURT:  Okay.  And counsel, forgive me.  Mr. Johns?

14             MR. JOHNS:  Correct.

15             THE COURT:  Thank you.

16             MR. DESTEFANO:  All right.

17             THE COURT:  Do you need to speak with me?

18             MR. DESTEFANO:  I'm having a problem with the notice

19   that -- I think I read the notice of witnesses, that they had no

20   witness.  Now we're getting a witness that has been undisclosed.

21             THE COURT:  So let me ask Mr. Jones for a proffer,

22   please.

23             MR. JOHNS:  Your Honor, if I may.

24             THE COURT:  Please.

25             MR. JOHNS:  In the correspondence that we sent to Mr.

1    DeStefano yesterday and then also to your chambers, we attached

2    an affidavit from --

3              THE COURT:  Uh-huh.

4              MR. JOHNS:  Mr. Mestichelli and then indicated we may

5    call him as a witness and so that is what we are attempting to do

6    now.

7              MR. DESTEFANO:  Which we object to on the grounds that

8    the affidavit was largely if not completely not on the point that

9    was designated for discussion today, namely the, the irreparable

10   harm aspect of it.  I read Mr. Mestichelli's affidavit as talking

11   mostly about payments and payments that were missing, payments

12   that were not missing, which I think is fairly clear there was

13   some negotiation and disputes over that over that whole issue.

14   And how does that go to irreparable harm?  I don't see it.

15             MR. JOHNS:  Your Honor, if I may?

16             THE COURT:  Please.

17             MR. JOHNS:  The question for irreparable harm is

18   whether or not the injunction will -- excuse me -- thank you --

19   whether the injunction will prevent the harm.  It is necessary.

20   The injunction must be necessary to prevent the harm.  Mr.

21   Mestichelli is going to talk, number one, about, in rebuttal to

22   what we've heard already today.

23             And number two, he's going to explain about the debts

24   that have been incurred, number one, for historic performances

25   and debts and that would be incurred if they were required to

1    continue to perform in Verizon Hall.  Those types of things that

2    -- whether or not those could even be paid, is an open question.

3    And it goes to whether or not the injunction would actually solve

4    for the harm that the POPS has alleged.

5              THE COURT:  One second.  I'm reviewing the

6    correspondence from yesterday.

7              MR. JOHNS:  Of course.

8              THE COURT:  We're going to take a brief ten minute

9    recess, please.

10             THE BAILIFF:  All rise.

11        (Recess taken from 3:34 p.m. to 3:46 p.m.)

12             THE COURT:  -- position, however, I am precluding his

13   testimony, based on the -- and his affidavit, based on the

14   limited scope of this evidentiary hearing today.  Any additional

15   witnesses?

16             MR. REED:  None from Defense, Your Honor.

17             THE COURT:  Okay.

18             MR. DESTEFANO:  None.

19             THE COURT:  Okay.  I'll hear from you?  Would you like

20   to make -- anybody like to make closing statements?  Briefly.

21             MR. DESTEFANO:  Yes, but let me ask a question.  Are

22   you going to require a briefing on this issue?

23             THE COURT:  No.

24                   PLAINTIFF CLOSING ARGUMENT

25             MR. DESTEFANO:  Your Honor, our case is that the --

1  well, I'm not going to argue our case, because we're in a narrow

2  scope of this, but the --

3          THE COURT:  Let me interrupt --

4          MR. DESTEFANO:  -- irreparable harm point --

5          THE COURT:  -- you, Mr. DeStefano --

6          MR. DESTEFANO:  Yeah.

7          THE COURT:  -- just so that we can make sure that we're

8  on the same page.

9          MR. DESTEFANO:  Sure.

10          THE COURT:  Are you agreeing that we're actually in the

11  realm of a mandatory injunction here?

12          MR. DESTEFANO:  Oh, yeah.

13          THE COURT:  As threshold issue.  I want to make sure

14  we're clear here, because that was unclear based on your opening.

15          MR. DESTEFANO:  The --

16          THE COURT:  So are you conceding that this would be a

17  mandatory injunction?

18          MR. DESTEFANO:  Yes.  This would definitely be a

19  mandatory injunction.

20          THE COURT:  Okay.  Thank you.

21          MR. DESTEFANO:  All right.  I submit, Judge, we -- that

22  we complied with the standard for irreparable harm, that it's

23  harm that can't be measured in money damages.  It's harm that

24  will occur, a substantial harm.  And it's harm that --  there's

25  -- assuming the other elements are met, it's harm that is -- it

1  doesn't have to be immediate.  There's several cases in this

2  jurisdiction, which hold pretty clearly.  A case by Judge Roof,

3  which I will dig it out.  It was affirmed by the Court of

4  Appeals.

5          Loss of reputation, loss of trade, loss of goodwill.

6  They constitute irreparable harm, because they're hard to

7  measure.  And I think the proofs here is that there has been and

8  will continue to be loss of reputation, goodwill, harm that can't

9  be measured in money damages and will be devastating to the POPS,

10 unless they're allowed to get back into Verizon Hall.

11          Judge -- the case with Judge Roof --

12          THE COURT:  Can you give me the case name, please?

13          MR. DESTEFANO:  Yes.  It's Instant Air Freight Company

14 v. CF Air Freight, Inc.

15          THE COURT:  Thank you, yes.

16          MR. DESTEFANO:   And I'll just give you the holding.

17 However, if the economic loss would force the business to shut

18 down, then irreparable harm may be found.  And I think it's

19 pretty clear on the evidence here that if not allowed back into

20 Verizon Hall, the POPS business would have to shut down.  And I

21 think it's pretty clear it's insolvent.  It has no prospect of

22 gaining any revenues that it could work with to pay back these

23 debts and become solvent, unless it's allowed back in Verizon

24 Hall and is allowed -- be able to reopen the tap to contributed

25 revenue, to ticket sales.

1          And I think it's pretty clear from the evidence here,

2    too, is that the POPS has always been allowed to pay over time,

3    so to speak, rather than immediately upon the concert.

4          THE COURT:  But Mr. DeStefano, isn't that, in part, why

5    we're here?  I mean, Ms. Corbin just testified that that was more

6    or less their business model was to rely on the hope.

7          MR. DESTEFANO:  Well, it's not a hope.  I think it's

8    more a course of conduct, Your Honor.  The -- you know, keep in

9    mind that the Kimmel Center is a nonprofit.  Its mission is to

10   provide a space to play for the performing arts.  Its mission is

11   not to have weddings or whatever.  And that, yes, there have been

12   contractual agreements.

13         THE COURT:  Correct.

14         MR. DESTEFANO:  But they've always been adjusted by the

15   party until when?  Until -- and you saw those emails and

16   whatever, the Philadelphia orchestra and the successor to Kimmel

17   Center, POKC, basically demanded, requested cajoled, did whatever

18   they could to get the POPS to stop performing and go out of

19   business.  And when the POPS refused to do that, then came a sea

20   change in the attitude of the Kimmel Center.

21         THE COURT:  We're here for the injunction.

22         MR. DESTEFANO:  I understand.

23         THE COURT:  Okay.  so I want --

24         MR. DESTEFANO:  We're here for the irreparable harm.

25   Okay.

1          THE COURT:  Right.  And Mr. DeStefano, what I'm saying

2    to you is we have multiple documents and agreements here.

3          MR. DESTEFANO:  Right.

4          THE COURT:  And in the end, I'm assuming, that the

5    Kimmel Center itself would like to continue being a

6    nonprofit --

7          MR. DESTEFANO:  Right.

8          THE COURT:  -- that is financially stable to provide

9    that venue --

10          MR. DESTEFANO:  Right.

11          THE COURT:  -- for other important assets, frankly, to

12    the Philadelphia community in the art world, in the musical art

13    world.  So if they're saying that they need -- that they demand

14    payment, right?  You're asking -- you're saying that your clients

15    relied on the fact that they gave grace before, that they would

16    give grace again.

17          MR. DESTEFANO:  I think when the repeated conduct was

18    to -- and I'm not sure it's grace.  It's to accommodate the need

19    for -- year after year, the need for -- we got to sell a few more

20    concerts to get you the money that we owe you for the concerts

21    before.  This became a common thing.  And you know, the course of

22    conduct -- you know, contracts can be amended by a course of

23    conduct.

24          And the issue here in this case is why did that course

25    of conduct change and we allege it's part of plan or a scheme or

1   a series of conduct that was specifically intentionally intended

2   to force the POPS to go out of business and it will do so, unless

3   it is allowed in back -- in Verizon Hall.  And I think if you're

4   looking at the injunction part of this case or the irreparable

5   harm, yes, irreparable harm will clearly befall the Philadelphia

6   POPS succession of business, no attempt to retrieve whatever

7   goodwill was already lost.

8           And if we're narrowly focusing on that issue, I think

9   legally the POPS has gotten over that issue.  I make no argument

10  on -- I mean, we've briefed and whatever on the other elements,

11  the likelihood of success on the merits, the -- you know, we have

12  an essential facilities case here, too.  I mean, you know, it's a

13  lease or no lease.  It's -- or -- right or no lease.  It's -- can

14  be an antitrust violation, violation of the Sherman Act to deny

15  access to an essential facility.  And that's one of our claims.

16          But again, we're not arguing the merits here.  I'm just

17  focusing on the essential element of irreparable harm.  And if

18  we're focusing on that and that's the purpose of this hearing, I

19  think we've made our case.

20          THE COURT:  Thank you, sir.  Mr. Reed.

21                  DEFENDANT CLOSING ARGUMENT

22          MR. REED:  Thank Your Honor.  I'll be brief.  I

23  think -- assume I can speak on behalf of all parties.  We really

24  appreciate the Court's time and attention to this matter.  I know

25  this is longer than you had anticipated.  It was longer than I

1    anticipated, but we really do appreciate your attention to this

2    important matter.  I'll be brief.  And I'll touch on some themes

3    that I touched on in the opening.

4          First of all, it's now conceded that what the POPS is

5    seeking is a mandatory injunction, right?  No dispute that the

6    license agreement has terminated.  There's no new license

7    agreement.  So they're asking for an injunction that forces my

8    clients to do business with the POPS, notwithstanding the absence

9    of an agreement and notwithstanding the fact that they've

10   admitted now that they owe at least more than $500,000 that

11   should have been paid under the terms of the agreement that said

12   time is of the essence.

13         So -- but we're talking about a mandatory injunction

14   and that has significance for this process and for the question

15   that you've raised in this hearing, because they are subject to a

16   much more stringent standard under the law.  It's the Hope

17   decision, H-O-P-E.  We've used that term in a different -- a

18   couple of different ways now, but the case I'm referring to is a

19   Third Circuit decision from 2020 and it's very clear that there's

20   a heightened standard that they must meet on all elements,

21   including on the irreparable harm element.

22         Mr. DeStefano said there's no requirement of immediacy.

23   He's wrong.  That's not the law.  The Hohe, H-O-H-E decision,

24   also cited our brief.  It's a Third Circuit decision 1989, states

25   very clearly that the irreparable harm must be both clear and

1    immediate.  Clear and immediate.  Let's talk about clear first.

2    There's no clear showing of harm here.  I think what we heard is

3    that the POPS have significant financial problems.  I think

4    that's probably something that my clients won't dispute.

5              But what they haven't done is given you the clear

6    showing that the Court -- that the law requires to conclude that

7    irreparable harm will occur, if they don't get the order that

8    they seek.  There's no -- first of all, they've offered no

9    evidence, no documentary evidence whatsoever.  I mean, we have

10   testimony, but it's vague testimony mostly from a volunteer board

11   member who spends maybe two hours a week, who acknowledged that

12   there's no audited financial statements yet.  The last financial

13   statements they got had a going -- a positive going concern

14   opinion from their auditors.

15             The information we got wasn't clear enough.  They don't

16   -- didn't give you the evidence that you need on that factor, but

17   frankly, that's not the strongest factor here for us.  There are

18   other major and fatal deficiencies in their case.  As I said, the

19   third circuit also requires that the harm be immediate.  The

20   witness, when I asked him is bankruptcy imminent, he said no.

21   They don't have any concrete plans.  They contemplate it.

22             Frankly, it may be overdue.  I don't know.  That's not

23   -- it's for them to decide, not me.  But what you didn't hear was

24   immediate harm.  What you heard is he, at least, the volunteer

25   treasurer has been thinking about this since January.  They filed

1   their motion in June and they're asking for concerts as early --

2   you know, the earliest concerts in September.  So they haven't

3   satisfied the immediacy requirement, either.  They also haven't

4   shown that the relief they seek is necessary.

5           I get that they would prefer to play at Verizon Hall.

6   I get that they like it better or maybe there's -- you know,

7   there's a pit for a chorus there that they'd like to use.

8   Frankly, there are a lot of people, a lot of nonprofit and other

9   organizations who would like to use our facility, too.  They pay

10  for it, they rent it and that's what allows us to keep the lights

11  on.

12          As Your Honor's questions reflected, there is a public

13  interest here and it's not just the POPS interest.  This facility

14  is used by many other organizations, who again -- we charge rent.

15  They pay rent.  They pay for the services.  They pay the people

16  who come in and do the work.  We can't continue to host an

17  organization that doesn't pay and get stuck with the bill.  We're

18  not going to let the ushers go without getting paid for their

19  time.

20          We're not going to -- we're going to pay the electric

21  bill.  We're going to pay the police.  We're going to pay

22  security.  We're going to pay the ticket takers, but it shouldn't

23  be on us.  Everybody else pays for it.  They have a contract to

24  pay for it and they haven't.  They hope they can turn it around.

25  They hope they can convince sponsors to come back.  Hope --I'll

1  leave it at that.

2          We have an obligation to more than just the POPS to use

3  the facility and to handle it responsibly and we have a right to

4  expect to be paid, but back to the necessary question.  They have

5  not shown that it's necessary for them to play.  They may want

6  to.  But is it necessary for them to make money?  They can

7  perform concerts at other venues, whether it's the Met or

8  elsewhere.  If the venue is too small for their taste, maybe they

9  put on a smaller concert or they use less musicians and they make

10 money in smaller increments.

11         Get out there and work and make money.  They have the

12 ability to perform.  They have the ability to sell so-called one-

13 off concerts to make money to pay off their debts.  They don't

14 need to only perform symphonic concerts in the -- on the holidays

15 in Verizon Hall and -- for subscription purchasers.  You even

16 heard the distinction between like the subscription ticket and

17 the one-off ticket.  Sell more one off tickets then.

18         Then they have the ability to generate -- to go out and

19 make money, if the business is run well.  But in any event, they

20 haven't shown that the only way that they can survive is to ask

21 us to foot the bill again for a series of concerts that they

22 likely -- very likely won't pay for.  So it's not necessary.  You

23 saw the pictures of the Met.  There's other venues that they

24 might use.  But in any event, they haven't shown that it's

25 necessary.

1         They certainly have -- you know, Mr. DeStefano talked

2  about essential facility.  That's merits, but if I ever get a

3  chance to address the merits, that's a dead loser, but I

4  understand that's not what we're here to talk about today.  They

5  haven't -- also, Your Honor, they haven't shown that the relief

6  they seek is sufficient to avoid the problems.  It's not

7  necessary, but it's also not sufficient.  I think you heard we

8  have a plan, but you didn't hear any details.

9         If they've gotten 1.1 million in tickets that they've

10  sold that they want to, you know, use as credits, how many

11  concerts are they going to have to perform before they can

12  actually make dollar one on new tickets?  And how do they pay off

13  their musicians?  How they pay their old debt to us, much less,

14  how do they pay for the cost of the new concerts?  This constant

15  like robbing Peter to pay Paul.

16         Well, we'll -- you know, we'll perform the next concert

17  and that'll pay for the one two times ago and then maybe next

18  time we'll catch up a little bit more.  You know, that's been

19  going on for years.  It has the feeling of inevitability.  I get

20  it, Your Honor.  But it's -- but again, so they haven't shown

21  that if you give them this order, if you were to compel us to do

22  business with them, despite this history with them, that somehow

23  that will be sufficient to solve their problems, it won't be.

24         They don't even have -- they don't have an answer at

25  all to how they're going to perform without musicians.  You heard

1   that.  You heard that repeatedly.  They don't have musicians to

2   play.  And so, if they don't even have musicians, think what

3   happens.  We end up booking -- we end up reserving the space and

4   then they never show up.  Talk about injury to your reputation,

5   harm to the Kimmel center.

6          I realize that's a different element that isn't the

7   focus of this hearing, but it -- but I can't ignore it, Your

8   Honor.  And it is something that Your Honor is required to

9   consider as one of the four elements on their motion.  It's the

10  third.  The first two are most important.  I get it. But please,

11  your Honor, don't forget the impact that this has on others,

12  including my clients.  Something that we take very seriously.

13         Yeah, they relied on goodwill.  They got a lot of

14  goodwill.  They got a lot of goodwill for years.  But at some

15  point enough is enough.  How many notices of fault?  How many

16  warnings?  How many second chances?  How many payment plans do we

17  have to give them before enough is enough?  Particularly when the

18  agreement they had and rates that they negotiated is now expired.

19         Your Honor, thank you again for your attention and I'm

20  happy to answer any questions you have.  Otherwise, I'll sit

21  down.

22         THE COURT:  Thank you very much.  Okay.  It is my

23  intent to issue my ruling today from the bench, so I am going to

24  ask for approximately 20 minutes, so I can get my ducks in a row.

25  Thank you.

1          MR. DESTEFANO:  Thank you, Your Honor.

2          THE BAILIFF:  All rise.

3       (Recess taken from 4:01 p.m. to 4:53 p.m.)

4          THE COURT:  Have a seat.  Thank you for your patience.

5    Federal Rule of Civil Procedure 65 governs this Court's issuance

6    of preliminary injunctions.  A preliminary injunction, however,

7    is not granted as a matter of right.  Preliminary injunction is

8    an extraordinary and drastic measure and one that should not be

9    granted unless the movant, in this case The POPS, must be clear

10   showing carry the burden of persuasion.

11          Therefore, this Court recognizes the principle that

12   preliminary injunction should be issued only in a clear and plain

13   case.  To grant a preliminary injunction, the Plaintiff must

14   establish the likelihood of success on the merits, that they will

15   suffer irreparable harm if the injunction is denied, and that

16   granting preliminary relief will not result in a greater harm to

17   the nonmoving party, and that the public interest favors such

18   relief.

19          This Court follows Third Circuit precedent holding that

20   the first two factors, the likelihood of success on the merits

21   and the likelihood to suffer irreparable harm are the most

22   critical to consider and thus the gateway factors as outlined in

23   Reilly vs. City of Harrisburg.

24          This Court finds no reason to address the merits of the

25   likelihood of success on the antitrust claims.  If Plaintiff

1  fails to meet their burden regarding either of the gateway

2  factors, whether the likelihood of success or irreparable harm,

3  then this Court need not consider the two remaining factors.

4  This Court will focus on whether the Plaintiff has satisfied the

5  second gateway factor.  Will The POPS suffer irreparable harm if

6  the injunction is denied. As conceded by both parties, Plaintiff

7  seeks a mandatory injunction.  And this Court will therefore

8  apply the heightened standard as outlined in NSCRO vs. New Castle

9  County (phonetic).

10        The law is clear in this circuit.  In order to

11  demonstrate irreparable harm, the Plaintiff must demonstrate

12  potential harm, which cannot be addressed by a legal or equitable

13  remedy following a trial.  The issuance of the injunction must be

14  the only way of protecting the Plaintiff from the harm alleged as

15  outlined in Campbell Soup Company.

16        The Third Circuit has stated that the mere risk of

17  irreparable harm is not enough. But rather, a Plaintiff must

18  present a clear showing of immediate irreparable injury.

19  Specifically, in Winter vs. NRDC, the supreme court has cautioned

20  that the issuance of a preliminary injunction based only on the

21  possibility of irreparable harm is inconsistent with the

22  characterization of injunctive relief as an extraordinary remedy.

23        Plaintiffs contend that they face irreparable harm

24  because they will be forced to consider filing for bankruptcy

25  given their current financial situation.  But it is not

1   sufficient that the requisite fear, injury, or harm is nearly

2   serious or substantial in terms of time, money, and energy as

3   outlined in Glasco vs. Hills. Proving that the economic loss will

4   force a business to shutdown demands meeting a significant

5   threshold for irreparable harm. On its face, Plaintiff's

6   contention that it will consider filing for bankruptcy is

7   undercut by the direct testimony of John Meko, stating a

8   bankruptcy filing is not imminent.

9           This Court finds that there's insufficient evidence on

10  this record indicating that any filing of bankruptcy, either

11  involuntary or voluntary is imminent.  Additionally, Encore has

12  failed to provide invoices regarding debts owed, the specificity

13  of those debts, nor any current financial statements regarding

14  the amount of cash on hand or credit available to them.

15          While Mr. Meko has alluded to the fact that projections

16  of return, corporate sponsorships, and patrons were made based on

17  the loss of goodwill, none of those projections were provided to

18  this Court.

19          The Third Circuit has cautioned against issuing a

20  preliminary injunction where the record lacked concrete evidence

21  showing that the Plaintiff was on the verge of bankruptcy, let

22  alone that it was suffering irreparable injury from the

23  Defendant's individual actions as outlined In Re Arthur

24  Treacher's Franchisee Litigation.

25          In Figueroa vs. Precision Surgical, the Third Circuit

1   has held that the district court is justified in refusing to

2   grant a preliminary injunction even when it will potentially

3   destroy a business.  If the loss is capable of ascertainment and

4   award a final judgment if the petitioner prevails.  Plaintiffs

5   contend that their financial future and the very existence of The

6   Philly POPS hinges on the outcome of this motion.  However, there

7   are a myriad of factors that have contributed to the financial

8   deficiencies of The Philly POPS and must be remedied in order for

9   this institution to remain solvent.

10          Specifically, evidence was placed on this record that

11   there's current a civil case pending in the Eastern District of

12   Pennsylvania filed by the American Federation of Musicians based

13   on allegations of the musicians of The Philly POPS were not paid.

14   The fact that those musicians were not paid is undisputed.  No

15   credible evidence has been placed on this record that musicians

16   that have historically performed with The POPS would be willing

17   to do so in light of the ongoing wage disputes between the

18   American Federation of Musicians and The Philly POPS.

19          Additionally, Plaintiffs have not presented sufficient

20   evidence to demonstrate that patrons are likely to return to see

21   The POPS based on their previous inability to fulfill tickets

22   sold for prior events.  Plaintiffs have also argued that they

23   have and will continue to suffer reputational harm if an

24   injunction is denied.

25          The Third Circuit has previously refused to make

1   extended causal inferences to find irreparable harm where

2   evidence in the record did not demonstrate the defendant's

3   actions directly contributed to the alleged reputational harm.

4   And that's at Bennington Foods LLC. vs. St. Croix Renaissance

5   Group.

6          In this case, Plaintiff has not created a sufficient

7   causal link between the eviction of The Philly POPS from the

8   Kimmel Center and the alleged reputational harm.  There is

9   evidence on the record that The Philly POPS financial

10  mismanagement led to the eviction from the Kimmel Center.  That

11  they canceled or rescheduled event at The Met just two days prior

12  to that performance.  And additionally, the action filed in this

13  district by the American Federation of Musicians against Encore

14  Series, Inc. on March 17th of 2023 for the nonpayment of wages to

15  musician, further damaged The POPS reputation.

16         This Court finds, based on the record and controlling

17  case law, Plaintiff has failed to meet the heightened burden

18  necessary to clearly prove immediate irreparable harm.

19  Therefore, the Plaintiff's motion is denied.  Thank you all very

20  much.

21         MR. DESTEFANO:  Just a question.  Will you be issuing a

22  footnote as order or a memo and order?

23         THE COURT:  I took my time issuing this one from the

24  bench so that I will not need to create an additional footnoted

25  order.  I will issue a written order, but my findings of facts

1    and conclusions of law are now on this record.

2              MR. DESTEFANO:  Okay.

3              THE COURT:  Thank you very much.

4              MR. REED:  Thank you.

5              THE CLERK:  All rise.

6         (Proceedings adjourned at 5:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: July 28, 2023

_____
Jessica B. Cahill, CER/CET-708